45389. WILLIAMS v. THE STATE.
(368 SE2d 742)

WELTNER, Justice.
Alexander Edmund Williams IV was convicted by a Richmond County jury of murder, rape, armed robbery, kidnapping with bodily injury, motor vehicle theft and financial transaction card fraud. He was sentenced to death for the murder. The case is here on appeal, for review under the Georgia Unified Appeal Procedure and for review of the death sentence under OCGA § 17-10-35.[1]

---

[1] The defendant was sentenced August 29, 1986. He filed a motion for new trial September 23, 1986, and two amendments thereto on October 2 and October 13, 1987. The hearing took place on October 14 and 15, 1987. The motion was denied November 12, 1987. The case was docketed in this court on January 13, 1988, and was orally argued March 7, 1988.

1. The victim, 16-year-old Aleta Carol Bunch, left school at noon on March 4, 1986, and drove her blue 1984 Mustang automobile to the Regency Mall in Augusta. She prepared for a modeling assignment, shopped at several stores in the mall, and left at 3:30 p.m. Her body was found in a remote, wooded area 11 days later.

On the evening of March 4, Alexander Williams drove a blue Mustang to a game room on Windsor Springs Road. He told his friends that it belonged to "a girl." With their assistance, he disposed of the car by abandoning it on a dirt road. He retrieved from the car a .22 caliber pistol, a pocketbook, and a shopping bag. He took the credit cards out of the purse, and threw the purse and its remaining contents into a dumpster. The next day, he treated his friends to a shopping spree at the mall, using the victim's credit cards. He also distributed items of jewelry the victim had been wearing when last seen alive, as well as items she had purchased the day of her death.

Williams told his friend John Jones that "she would never tell" and that he "didn't feel a thing about that night [and] what he had done to the girl." He told Leon Bacon that he had met the girl at the mall and followed her outside to her car. He told her to get in the car and he drove. Then "he had sex with her . . . [and] . . . she was moaning . . . so to keep her quiet he shot her." He first told Harold Lester that he had merely found the credit cards. The next day, however, he admitted to Lester that "he had killed this girl." He asked Jerry Smith if he had ever shot anyone before. When Smith answered yes, Williams asked him what he had done with the body. Then he admitted to Smith that he had killed a girl he had met at the mall.

He also admitted to Margaret Jeffords that he had killed the girl. When Jeffords threatened to report him, Williams replied, "Well have you ever heard of kill and kill again? . . .I did it once and you damn well better believe I'll do it again."

The victim was shot five times — once in the chest, and four times in the head. Her body was nude below the waist, and the crime scene showed signs of a struggle. The murder weapon was not recovered. However, one of Williams' friends took investigators to an area where Williams had shot his gun and they recovered some empty cartridge cases that were consistent with having been fired from the same gun — an RG .22 caliber revolver — as the bullets recovered from the body of the victim.

The autopsist testified that the victim had engaged in sexual intercourse at some indeterminable time in the past. He further stated, however, that there was a "small contusion or bruise on the back of the vaginal wall," suggesting that sexual intercourse "occurred immediately surrounding the time of death."

The defendant contends the evidence is insufficient. We disagree. The jury was authorized to conclude from the evidence that Williams

accosted the victim in the mall parking lot, forced her to accompany him to a secluded area where he raped and murdered her, then took her jewelry, her pocketbook and her automobile, and used her credit cards the next day. The evidence supports his conviction on all counts. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Compare *Lipham v. State*, 257 Ga. 808 (1) (364 SE2d 840) (1988).

2. Williams was arrested March 12. He was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966) by investigator Ronnie Strength. Williams waived his rights orally and stated that he wanted to talk to Strength alone, in another room, because he did not like the one they were in. After relocating, Williams asked Strength "what kind of prison time" he would serve "if he talked . . . about the missing girl." Strength advised him that he "wasn't in the deal-making business, and . . . was not authorized to make any deals in this case." Then, Strength testified:

> He told me that it wasn't a kidnapping, and, again, wanted me to write out some type of deal on paper if he talked to me about the girl; of course, again I refused. I further questioned him on the credit cards that were used at the mall. He told me that he was at the mall and saw a purse in a blue car; that the door was unlocked, and that he took the purse and the credit cards, and that he had gone to the mall and used them and bought him some tennis shoes, and that the tennis shoes were at his home under the bed. I asked him a little further about the car, and he told me that he had left the car in the parking lot . . . of the mall. . . . He again, for the third time, asked me about making a deal if he would talk to me about the missing girl. Of course, for the third time I told him that I could not make a deal; that I was not authorized to make any deals. I asked him about his whereabouts on the date and time of the incident, and, of course, he said that he did not know. At that point he told me that he had better talk to a lawyer, and that after he talked to a lawyer that he would talk to me again about the missing girl. And, of course, at this time, once he requested a lawyer, I terminated the interview.

Williams contends that his refusal to sign a written waiver and his attempts to condition his discussion of the girl upon receiving a promise of leniency amounted at least to an equivocal assertion of his right to counsel and that the interview should not have taken place until the interrogator clarified this equivocal request. See *Hall v. State*, 255 Ga. 267 (336 SE2d 812) (1985).

Williams refused to sign a written waiver because he "didn't want to sign anything." His oral waiver was valid nonetheless, and neither his refusal to sign the waiver nor his attempt to make a "deal" with his interrogator was an invocation of his right to a lawyer. When the defendant did invoke that right, the interrogator terminated the interview. *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981).

Williams also argues that the officer's testimony concerning his invocation of his right to counsel should not have been presented to the jury as a comment on his exercise of his right to remain silent. See *Hill v. State*, 250 Ga. 277 (4) (295 SE2d 518) (1982); *Doyle v. Ohio*, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976). The defendant did not remain silent. He discussed the crime, and then he invoked his right to a lawyer. *Doyle v. Ohio* does not apply in this situation. *Wainwright v. Greenfield*, ___ U. S. ___ (106 SC 634, 642, ___ LE2d ___) (1986) (Rehnquist, J., concurring).

3. The trial court did not err by allowing in evidence a photograph to show the condition of the victim's body.

4. There is no merit to the defendant's contention that the court's jury instructions included an expression of opinion in violation of OCGA § 17-8-57 as to what the evidence proved. The instructions on presumption of innocence were complete and correct, and it was not error to refuse to give the defendant's requested instruction on the same principle. *Kelly v. State*, 241 Ga. 190 (243 SE2d 857) (1978).

5. The court overruled Williams' objection to the following testimony:

Q. [by DA to investigator Strength]: Who directed you to that location [where the body was found] out on Story Mill Road?
A. Doug Flanagan.
Q. Mr. Flanagan . . . is a lawyer?
A. Yes, sir.
Q. Who was Alex Williams' lawyer at that time?
A. Doug Flanagan.

This testimony, Williams argues, violated his attorney-client privilege, and the trial court erred by overruling his objection to it.

Our Code recognizes certain privileges, including the attorney-client privilege, and prohibits the evidentiary use of communications protected by the privilege. See OCGA §§ 24-9-21, 24-9-24 and 24-9-25.

The state argues that the privilege was not violated because (1) Flanagan himself did not testify, (2) Flanagan would have been guilty of a crime had he not revealed the location of the body, and (3) the defendant failed to show that Flanagan learned of the location of the

body as a consequence of a privileged communication from Williams.

(a) While the state is likely correct that Flanagan had a positive obligation to reveal the location of the body to law enforcement officers, (see OCGA § 16-10-50; compare *People v. Meredith*, 631 P2d 46 (Cal. 1981)), it does not follow of necessity that the state should disclose to the jury the source of the information that led to the discovery of the body. One state, at least, has held to the contrary:

> We think the attorney-client privilege should and can be preserved even though the attorney surrenders the evidence he has in his possession. The prosecution, upon receipt of such evidence from an attorney . . . should be well aware of the existence of the attorney-client privilege. Therefore, the state . . . should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury and prejudicial error is not committed. By thus allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to disclose the source of the evidence, the client's privilege is preserved and a balance is reached between these conflicting interests.

*State v. Olwell*, 394 P2d 681, 685 (Wash. St. 1964).

(b) While the record does not establish unequivocally that Flanagan learned the location of the body from the defendant or as a direct result of communications with the defendant, it is unlikely that Flanagan obtained the information from another source. Moreover, if the state was *not* trying to create an inference that the victim's body was discovered because Williams had revealed its location to his attorney, it was not necessary to tell the jury that Flanagan was Williams' attorney. In short, offering such testimony was a dangerous practice, and one we disapprove.

(c) Nevertheless, Williams admitted his guilt many times. The testimony complained of here added nothing significant to these admissions of guilt, and any error was harmless.

6. Williams, who is black, raises an issue of discrimination in the prosecutor's exercise of peremptory challenges. See *Batson v. Kentucky*, 476 U. S. ____ (106 SC 1712, 90 LE2d 69) (1986). The record shows that blacks comprised 24% of the qualified panel of 42 from which the jury was selected, and 42% of the qualified panel of 12 from which the three alternates were selected. The prosecutor used six of his ten peremptory strikes to excuse blacks from the panel of 42 and one of his three peremptory strikes to excuse a black from the alternates. The jury as initially selected included four blacks (33% of the total), while two of the three alternates were black (66.7% of the

total). Later, one white juror was excused for medical reasons, and a black alternate took his place. Thus, the jury which convicted Williams and sentenced him to die included five blacks — 41.7% of the total. The facts do not support Williams' contention that his jury was selected in a racially discriminatory manner. *Aldridge v. State*, 258 Ga. 75 (4) (365 SE2d 111) (1988); *Gamble v. State*, 257 Ga. 325 (4) (357 SE2d 792) (1987).

7. Williams, an indigent, was represented at trial by an appointed counsel. After the trial, he was relieved of his appointment, and attorney Richard Allen was appointed to represent Williams at the post-conviction proceedings. The issue of effective assistance of counsel was raised on motion for new trial. After hearing evidence on this issue, the trial court determined that the defendant received effective assistance of counsel at trial. Williams contends this finding was erroneous. The issue is before us properly on appeal. *Cook v. State*, 255 Ga. 565, 578 (17) (340 SE2d 891) (1986).

Except in unusual circumstances not present here,[2] the burden is on the defendant claiming ineffectiveness of counsel to establish (1) his attorney's representation in specified instances fell below "an objective standard of reasonableness" *and* (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U. S. 668, 695-96 (104 SC 2052, 80 LE2d 674) (1984).

Williams contends his attorney was ineffective because he (1) failed to object to inadmissible evidence and improper argument by the prosecutor, (2) failed to discover and present mitigating evidence, (3) failed to conduct substantive death-qualification voir dire, to object to the excusal of qualified venire persons with scruples against the death penalty, and to challenge venire persons biased in favor of a death sentence, (4) failed to request the court to investigate a report that the jury had begun deliberations prematurely, (5) failed to request a psychiatric evaluation, and (6) attempted to exclude the testimony of certain state's witnesses when there was no legal basis for doing so.

At the sentencing phase of the trial, the state offered in aggravation an indictment, Williams' plea of guilty to the indictment, and the sentence imposed under the Georgia First Offender Act, OCGA § 42-8-60 et seq., for the offenses of entering an automobile and theft by taking. His lawyer did not object to this evidence. Williams contends that because no adjudication of guilt was made under the terms of the Act and the court's disposition of the guilty plea is not "considered . . . a criminal conviction," it was inadmissible.

---

[2] See, e.g., *United States v. Cronic*, 466 U. S. 648 (104 SC 2039, 80 LE2d 657) (1984).

Evidence in aggravation is not limited to convictions, *Devier v. State*, 253 Ga. 604 (9) (323 SE2d 150) (1984), and reliable information tending to show a defendant's general bad character is admissible in aggravation. *Fair v. State*, 245 Ga. 868, 873 (268 SE2d 316) (1980). Failure to object was not ineffective assistance.

The state also offered in aggravation, without objection, the testimony of a juvenile probation officer concerning Williams' unruly conduct ("status offenses" in juvenile law), and as to three acts of delinquency.

Williams contends that his lawyer should have objected to this testimony. He contends that the juvenile probation officer did not witness his activity, but only the court proceedings generated by it, and that his testimony was therefore hearsay.

Trial counsel testified at the motion for new trial that the probation officer's testimony appeared to be based on records of the juvenile court to which he referred while testifying. An objection to the testimony would have resulted in the introduction of the records themselves, and, in his opinion, would have accomplished nothing. This was not a deficiency.

Williams contends that his lawyer should have objected to the prosecutor's closing argument.

The prosecutor told the jury to consider

everything that you have heard during the course of this trial . . . all of these many things [he gave some examples], and you will then weigh the one against the other and you will decide what is the appropriate punishment.

Williams contends this was a misstatement of law, pointing out that "juries are not required to balance aggravating circumstances against mitigating circumstances[,]" *Ford v. State*, 257 Ga. 461, 464 (360 SE2d 258) (1987), and that, as the trial court charged, the jury is authorized to impose a life sentence even if it finds one or more statutory aggravating circumstances and *no* mitigating circumstances. The prosecutor's argument was not such a clear misstatement of law as would compel an objection.[3]

The prosecutor's argument that Williams had shown no remorse was not an improper comment on his right to remain silent. Nor do we find improper his argument that "you are not being asked to do anything but follow the law." It is clear from the argument as a whole that the prosecutor was telling the jury only that death was a lawful

---

[3] Indeed, if this part of the argument was anything more than mere "throat-clearing," it did not purport to advise the jury on the law, nor did it approach any usurpation of the trial judge's functions.

punishment, *not* that the law compelled a death sentence.

Finally, the prosecutor did not exceed the bounds of permissible argument by asserting that Williams did not deserve to have his life spared so he could go to the penitentiary and get free food, housing and medical attention, while the victim lay in her grave. See *Ford v. State*, 255 Ga. 81, 93 (335 SE2d 567) (1985).

Two witnesses testified in mitigation on behalf of Williams — his mother and a female friend. Williams contends that at least four additional witnesses should have been called to testify in mitigation.

Trial counsel testified that one of these witnesses — a minister — told him he knew little about Williams, and that others, whose names were furnished by Williams or his mother, did not wish to become involved in the case. Indeed, even Williams' mother was reluctant to testify, and she admitted to his lawyer that she had lost control of him three years before, and knew little of him since that time. None of the prospective witnesses who Williams now claims should have been called in mitigation testified at the hearing on the motion for new trial, and the record does not show what they might have testified. Compare *Cook v. State*, 255 Ga., supra. Hence, Williams has failed to show that their testimony probably would have resulted in a different verdict.

Williams complains of Collins' failure to object to the excusal of one prospective juror on *Witherspoon* grounds or to ask questions of the juror, and of his failure to challenge two prospective jurors on reverse-*Witherspoon* grounds. See, e.g., *Pope v. State*, 256 Ga. 195 (7) (345 SE2d 831) (1986).

The voir dire of the excused juror was brief and his answers somewhat ambiguous, but he stated that he automatically would vote for a life sentence if the defendant were convicted. The other two prospective jurors testified that if the defendant were convicted and the crime "calls for the death sentence," they would vote to impose it. Their answers did not show them to be incompetent. Compare *Pope v. State*, supra.

Trial counsel testified that he felt the trial court's ruling on the first juror was correct, but that, in addition, although he could not remember specifically how he had felt about this particular juror, he "sometimes let people go off of a jury because they looked like . . . they would be adamant toward me. . . ." He explained his reasons for not challenging the other two prospective jurors as follows:

> [S]ometimes when you've got a juror who you think you ought to challenge for cause, maybe you let him stay because you've got 20 strikes coming to you . . . [S]ometimes you challenge for cause and you get the jurors coming up — the next one's coming up mad at you. And if you do challenge,

then they are going to know how to answer your questions. So you don't always press it to the ultimate limit every time because you've got 20 peremptory challenges coming, and you're making notes . . . I have to play it by ear.

The record does not show that counsel's decisions concerning the extent of his voir dire examination and whether or not to interpose challenges were not reasonable tactical decisions.

During a recess at the guilt phase of the trial, the court received a note from one of the jurors that "some deliberation has begun and I'm concerned . . . that some jurors may be swayed in their views, thus affecting a future verdict." The court instructed the jury not to begin its deliberations until it had heard all of the evidence and had been instructed by the court on the law.

Williams contends the court's response was "totally inadequate" and that his lawyer should have asked the court to question the jurors to determine if any of them "had formed fixed and unyielding opinions at this point." Counsel's inaction here simply does not fall outside "the wide range of reasonable professional assistance" *Strickland v. Washington,* supra, 104 SC at 2066. Compare *Hill v. State,* 250 Ga. 277 (7) (295 SE2d 518) (1982).

Williams complains that his lawyer failed to request a psychiatric examination. His lawyer testified that he did not ask for an examination because: Williams "just never struck me as being the type of person who needed a psychiatric evaluation"; Williams' only problem was that he thought he knew more than his attorney; and he believed he would not be convicted because the state's witnesses were his friends and would not testify against him.

At the hearing on the motion for new trial, Williams' mother testified that while still a juvenile Williams had spent a week at "Georgia Regional," apparently for a mental evaluation. This information was not communicated to trial counsel until after the trial was over.

Assuming that counsel should have known of the mental evaluation (even though neither Williams, nor his mother, nor any other members of his family gave him any information as to any mental problems) and should have pursued this possible avenue of mitigation, Williams has failed to establish prejudice. He has not shown why or by whom he was sent to "Georgia Regional" for an evaluation, or what may have been the result of such an evaluation.[4] The burden is on the defendant to show that his attorney's omissions have prejudiced his case — here, that he has a mental condition that

---

[4] One question by the defendant's present attorney at the hearing suggests that the juvenile court may have requested the evaluation. See MNT transcript, p. 14. However, there is no testimony establishing anything about the evaluation.

should have been investigated and offered in mitigation. He has not done so.

That his lawyer objected to damaging testimony of state's witnesses was not deficient, even if the objections lacked merit. Moreover, the defendant's case could not have been prejudiced by this attempt.

We conclude that Williams was not denied effective assistance of counsel.

8. Williams raises several claims of error regarding matters to which no objection was made at trial. These have been treated above, in the context of his claim of ineffectiveness of counsel. Because no objection was raised at trial, we do not address these claims of error directly.

9. Williams argues that because he was 17 years old at the time of the crime, the trial court should have refused to allow the imposition of a death sentence. OCGA § 17-9-3 bars the imposition of the death penalty when a defendant was *under* the age of 17 when he committed the crime. *Bankston v. State*, 258 Ga. 188 (367 SE2d 36) (1988). Williams' death sentence does not violate this provision. *Legare v. State*, 250 Ga. 875 (4) (302 SE2d 351) (1983).

10. The court's instructions on aggravating and mitigating circumstances were not erroneous. *Romine v. State*, 251 Ga. 208 (10) (305 SE2d 93) (1983).

11. After the jury had been deliberating for half an hour on the question of sentence, the foreman reported:

> [O]ne of my jurors has asked that he would rather not decide this case. I don't know what else to do, he said he don't want no part of it. So I knew nothing else to do but to address the court with it.

The court responded by stating to the jury:

> It is the juror's obligation to decide the case. Now what the jury wants to decide is of no concern to the Court, as I have previously instructed you; but it is the obligation of the jurors to decide the case. That doesn't mean that you would necessarily agree, you might not be able to agree. I don't say that you will or you won't, but it is necessary that the verdict be unanimous. And under your oath as a juror you're not supposed to go back and just decide, "I don't want to have anything to do with it." You're in the jury box.

Williams contends this charge was coercive. There was no error. The trial judge did not tell the jury that it had to reach a verdict; he only told the jury that it had an obligation to deliberate and try to

reach a verdict. See *Romine v. State*, 256 Ga. 521, 525 (1) (350 SE2d 446) (1986) ("[U]nder Georgia law a jury is expected to review the evidence and to endeavor to reach unanimity 'one way or the other' on the question of sentence, and, if possible, to affirmatively and unanimously recommend either death or mercy.")

12. The jury found that the murder was committed while the defendant was engaged in the commission of kidnapping with bodily injury, armed robbery and rape. See OCGA § 17-10-30 (b) (2). The evidence supports the jury's finding. OCGA § 17-10-35 (c) (2).

13. The sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factor, OCGA § 17-10-35 (c) (1), and is neither excessive nor disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases in the Appendix support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 9, 1988.

*Richard E. Allen,* for appellant.

*Sam B. Sibley, Jr.,* District Attorney, *Michael J. Bowers,* Attorney General, *Leonora Grant,* for appellee.

APPENDIX.

*Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Stevens v. State*, 245 Ga. 583 (266 SE2d 194) (1980); *Burger v. State*, 245 Ga. 458 (265 SE2d 796) (1980); *Hardy v. State*, 245 Ga. 272 (264 SE2d 209) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Ruffin v. State*, 243 Ga. 95 (252 SE2d 472) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Morgan v. State*, 241 Ga. 485 (246 SE2d 198) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978).