## A89A0480. BARNETT v. THE STATE.
(382 SE2d 620)

BEASLEY, Judge.

Barnett appeals his conviction and sentence for aggravated assault with the intent to rape, OCGA § 16-5-21 (a) (1).

1. Appellant contends that the trial court committed reversible error when it allowed the State to strike prospective juror Burdette in violation of *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). He maintains that the State's explanation that it struck Burdette because members of her family had criminal records was disingenuous, that the family did not have a criminal history, and that the State's real reason was racially motivated in that it did not want a second black member of the jury.

Following voir dire of the forty-two veniremen, three of whom were black, defendant, who is black, orally challenged the array on the basis that only 7.14 percent of the venire was black while the black population of the county was 11.4 percent resulting in a "comparative disparity of over 35 percent." The court rejected the challenge.

A jury of twelve was selected. The trial court inquired if there were any exceptions to the twelve. The State had none; the defense indicated it did. The court for the purpose of the record then outlined the procedure it had followed in selecting the jury: The court had forty-two jurors qualified and then put the jurors on the defendant. The forty-two were divided into three panels of fourteen. Each panel was called into the box and a silent method of juror selection was employed so that the veniremen did not know whether or not they had been selected or excused or by whom. Panel one contained black venireman Gibson. Panel two contained black veniremen Woodruff and Burdette. Defendant's challenge was only as to the racial composition of the forty-two in relation to the community and not as to the entire jury box.

The court noted that Gibson and Woodruff were both excused by the State and that Burdette was accepted. Defendant objected that of the three black potential jurors, only one was selected, that this raised a prima facie case for a *Batson* violation under *Barton v. State*, 184 Ga. App. 258 (361 SE2d 250) (1987) and that the State needed to come forth with explanations for striking the two black veniremen.

The court stated that without ruling that a prima facie showing had been made that it was going to ask the State to explain the strikes.

The State explained that Gibson was struck because she had a record of a "prior criminal instance" and because when questioned about her marital status, she indicated she was separated. The State said it struck Woodruff because he gave no employment history and

because of his nearness in age to the defendant. The court inquired if there had been others out of the forty-two who were near in age to defendant and who had been accepted. The State said it did not remember or did not know but that it had accepted a couple of women who appeared to be fairly close in age to defendant but who had been struck by the defendant.

The court asked if Woodruff had been struck solely because of employment. The State reiterated that he had been struck because of unemployment and age. The court inquired if the State had accepted any unemployed veniremen and was told no. The defense interjected that its notes indicated that Woodruff was employed and argued that age was not sufficient justification for striking Woodruff. The clerk was directed to examine the take-down on the question of Woodruff's employment. The record reflected that Woodruff was employed.

The court informed the State that its basis for excusing Woodruff was thus insufficient and that for jury selection, the parties would return to the second panel which contained Woodruff and start from there. The State would not strike Woodruff, he would be on the defendant and selection would go on through the panel. The court indicated that although Burdette had been accepted by the State, it could rethink its thoughts on her but since she was black the State would need a reason if it sought to excuse her.

Selection proceeded with defendant accepting Woodruff and the State striking Burdette. Defendant again objected that inasmuch as only one of three blacks was selected, there was prima facie discrimination under *Barton*. The State explained that Burdette was struck because records showed that members of her family had numerous criminal offenses. See statement of facts in *Sparks v. State*, 185 Ga. App. 225, 226 (363 SE2d 631) (1987). The court accepted the explanation, an alternate was selected, and the jury with one black member was sworn.

Defendant's argument is that the State's claim that Burdette's family had a criminal history was false. Defendant did not request that the trial court require the State to produce evidence for its claim about Burdette's family nor did defendant seek additional time or means to attempt to refute it. Defendant did not, after trial, produce any evidence to support his allegation that Burdette's family did not have a criminal history. We cannot say that the court's acceptance of the State's explanation was clearly erroneous. See *Evans v. State*, 183 Ga. App. 436, 440 (3) (359 SE2d 174) (1987).

Even if we assume appellant is correct as to criminal history, his burden is not fulfilled.

"To establish a prima facie case of purposeful discrimination in jury selection under *Batson*, a defendant must show 'that he is a member of a cognizable racial group, (cit.) . . . that the prosecutor

has exercised peremptory challenges to remove from the venire members of the defendant's race, . . . that these facts and any other relevant circumstances raise an inference that the prosecutor used (the) practice (of peremptory strikes) to exclude the veniremen from the petit jury on account of their race. . . .'" *Barton,* supra at 259 (2). Statistics, as "other relevant circumstances," may raise an inference of racial motive or intent but may also be considered on the larger question of the existence of a prima facie case of discrimination. *Aldridge v. State,* 258 Ga. 75, 79 (4) (365 SE2d 111) (1988).

Black persons composed 7.14 percent of the forty-two from whom the jury was selected and 8.33 percent of the jury of twelve. There was a net increase of more than a percentage point in the black composition of the jury following peremptory strikes. Even if the State's use of its strike against Burdette, considered in isolation and with the assumption of the truthfulness of appellant's claims, could raise the inference of racial intent, the resulting composition of the jury does not lead to a prima facie case of discrimination. Id. See also *Williams v. State,* 258 Ga. 281, 285 (6) (368 SE2d 742) (1988).

2. Appellant's plea in bar and motion to suppress identification by the victim at the one-on-one show-up were based on suggestiveness because he was handcuffed and surrounded by at least two police officers. Appellant gives as authority *Neil v. Biggers,* 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972) and other cases dealing with Federal Constitutional mandates.

The evidence is construed so as to uphold the verdict. *Thomas v. State,* 175 Ga. App. 873, 874 (1) (334 SE2d 903) (1985). Barnett entered Lillian's Bakery one morning and asked the sole present female employee a question and then left. Around 8:30 a.m. the next day, Barnett returned. The same employee was again alone. The store was lit by two long flourescent lights and the store's front and side were glass. The employee's attention was first drawn to Barnett's entry when the bell over the front door rang. The employee went behind the register counter and asked if she could help him. Barnett asked for a paper sack. The employee could not provide one and Barnett walked over to look at some displays. The employee was able to view Barnett from head to toe. She became nervous because Barnett loitered and did not seem to want anything. The employee watched him as she resumed decorating cakes. Barnett kept asking about various things and left after about ten or fifteen minutes.

A short time later, Barnett came back, dressed the same but now carrying a paper sack. The employee was still the only other person present. Barnett looked at the cakes and asked prices. The employee rang up some goods Barnett said he wanted. When it came time to pay, Barnett stuck his hand in his pocket and said he left his wallet at home and did not have any money. During this encounter, the em-

ployee was two or three feet from Barnett and was paying attention to him.

The employee went back behind the counter to finish decorating cakes. Barnett asked questions about the cakes and started to come around the corner where the employee was working. The employee told Barnett he was not allowed behind the counter. Barnett walked to the other side of the counter. He leaned over it and kept watching the employee, making her nervous. As the employee had her back to Barnett, he came up behind her and stuck the paper bag which was on his left hand in her left side. He said, "I've got a gun. Don't give me any trouble, Bitch."

The employee told Barnett money was in the register and to get it. He replied that he did not want the money. He told the employee to get in the back room. She refused. He pushed her four or five feet into the back room and up against some shelves. He hit her, threatened to kill her, and instructed her to get on the floor and remove her clothes. She refused and he hit her again, on the left side of her face. He started pulling at her shirt and telling her to take her clothes off. The employee told Barnett the man next door at the garage would be in to get his coffee in just a minute. Barnett warned her not to scream but she screamed for "Don." Barnett again warned her and said he would kill her. The employee screamed for "Don" again and Barnett ran out. The employee watched Barnett run down the street and then summoned the police, to whom she described the perpetrator.

Five or ten minutes later, the police brought Barnett to the bakery for the employee to look at. They took him out of the police car and stood him in front of the window. The employee got a good look at him and was positive that Barnett was the man who had earlier assaulted her. He was dressed the same but his pants were rolled up.

" 'The evil to be avoided is the . . . misidentification of an accused. The holding of *Neil v. Biggers*, 409 U. S. 188, 196-201 (93 SC 375, 34 LE2d 401) is that a two-step analogy is to be used. First, an impermissibly suggestive identification procedure is to be avoided. Only if it was suggestive need the court consider the second question — whether there was a substantial likelihood of irreparable misidentification. [Cit.]' [Cit.] . . .

"Although one-on-one show-ups have been sharply criticized, and are inherently suggestive ([cit.]), the identification need not be excluded as long as 'under all the circumstances the identification was reliable notwithstanding any suggestive procedure. (Cits.)' (Cit.) Our inquiry, therefore, must focus upon whether, under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification. '(T)he factors to be considered in evaluating the likeli-

hood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' *Neil*, supra, 409 U. S. at 199-200." *Killens v. State*, 184 Ga. App. 717, 720 (3) (362 SE2d 425) (1987).

The victim spent a substantial amount of time with the perpetrator in a well-lighted setting, seeing him on three separate occasions. She was not a casual observer but paid close attention and was able to describe him in great detail. The show-up was close in time to the criminal incident and the victim was unequivocal in her identification of defendant at the show-up.

Under the totality of these circumstances, the victim's identification was sufficiently reliable for the jury to consider notwithstanding any suggestive procedure. See also *Tillman v. State*, 184 Ga. App. 210, 212 (3) (361 SE2d 66) (1987).

In addition, the victim testified that her in-court identification of the defendant was based on her recollection of what happened to her during the incident. Her identification of the defendant had an independent basis other than the prior show-up identification. *Killens v. State*, supra at 721 (3).

*Judgment affirmed. Carley, C. J., and McMurray, P. J., concur.*

DECIDED MAY 5, 1989 —
REHEARING DENIED MAY 15, 1989 — ▆▆▆▆▆▆▆

*James C. Wyatt*, for appellant.
*Stephen F. Lanier, District Attorney, Harold Chambers, Assistant District Attorney*, for appellee.