S98P0612. PYE v. THE STATE.
(505 SE2d 4)

CARLEY, Justice.

A jury found Willie James Pye guilty of malice murder, kidnapping with bodily injury, rape, armed robbery, and burglary. For the murder, the jury recommended a death sentence, finding as four separate statutory aggravating circumstances that Pye had committed that crime while engaged in the commission of the offenses of kid-

napping with bodily injury, rape, armed robbery, and burglary. OCGA § 17-10-30 (b) (2). Pye's motion for new trial was denied and he appeals.[1]

## Jury Selection

1. Pye contends that the State violated *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) by using four peremptory strikes against black prospective jurors. The record shows that the State gave reasons for these four peremptory strikes, rendering the necessity of a preliminary showing of prima facie discrimination moot. *Hernandez v. New York*, 500 U. S. 352, 359 (111 SC 1859, 114 LE2d 395) (1991); *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993). After a hearing, the trial court ruled that Pye did not meet his burden of showing that the State had acted with discriminatory intent. This ruling will be affirmed unless it is clearly erroneous. *Turner v. State*, 267 Ga. 149, 151 (2) (476 SE2d 252) (1996).

In one instance, the State exercised a peremptory strike because inquiries in the community led the prosecutor to believe that the prospective juror was argumentative and might prevent the return of a unanimous verdict. The State "may rely on information and advice provided by others so long as this input is not predicated upon the race of the prospective juror." *Barnes v. State*, 269 Ga. 345, 350 (6) (496 SE2d 674) (1998). See also *Lewis v. State*, supra at 681 (2). The trial court did not err by accepting the State's reason for the strike of this juror, because there was no discriminatory intent inherent in the State's explanation and it was not so implausible as to render the explanation pretextual. See *Purkett v. Elem*, 514 U. S. 765 (115 SC 1769, 131 LE2d 834) (1995); *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995).

The prosecutor struck another prospective juror who testified that she was conscientiously opposed to the death penalty and believed that life without parole was a greater deterrent than a death sentence. The prosecutor also stated that his assistant had known this juror for years and believed that she would be unable to vote for imposition of the death penalty. These were valid race-neutral reasons sufficient to justify a peremptory strike. See *Tharpe v. State*, 262 Ga. 110, 112 (6) (416 SE2d 78) (1992); *Barnes v. State*, supra. Pye

---

[1] The crimes occurred on November 16, 1993 and the grand jury indicted Pye on February 7, 1994. On April 19, 1994, the State filed its notice of intent to seek the death penalty. The trial was held May 28-June 7, 1996. In addition to the death sentence for the murder, the trial court imposed three additional life sentences plus twenty years, all sentences to be served consecutively. Pye filed a motion for new trial on July 3, 1996, which was denied on August 22, 1997. Pye filed his notice of appeal on September 16, 1997, and the case was orally argued on April 13, 1998.

complains that the State did not strike white prospective jurors who testified that they believed that life without parole was a greater deterrent than death. The record reveals, however, that these white jurors did not state, as this prospective juror did, that they were also conscientiously opposed to the death penalty.

The prosecutor struck a third prospective juror because she testified that she was conscientiously opposed to the death penalty, even though she later said that she could vote for a death sentence. As previously stated, this is a valid race-neutral reason sufficient to justify a peremptory strike. *Tharpe v. State*, supra. The prosecutor further stated that this prospective juror's son was a public defender in Atlanta. This reason is also sufficient to justify a peremptory strike, because the explanation was neither inherently discriminatory nor implausibly pretextual. See *Purkett v. Elem*, supra; *Jackson v. State*, supra.

The State struck the fourth prospective juror because he seemed confused by the voir dire questions and repeatedly contradicted himself about his opinion on the deterrent value of a death sentence, his impartiality, and whether he was conscientiously opposed to the death penalty. This explanation is supported by the voir dire transcript and is a valid race-neutral reason. See *Purkett v. Elem*, supra; *Jackson v. State*, supra.

In none of the four instances was the trial court's *Batson* ruling clearly erroneous. Accordingly, this enumeration of error is without merit.

2. Pye complains that the trial court failed to ask prospective jurors on voir dire whether they would consider mitigating circumstances or would automatically impose a death sentence if Pye was convicted of murder. Because Pye did not request the trial court to ask these questions, he cannot now complain. *Durham v. State*, 239 Ga. 697, 699 (2) (238 SE2d 334) (1977); *Eberheart v. State*, 232 Ga. 247, 251 (3) (206 SE2d 12) (1974), vacated in part on other grounds, *Coker v. State*, 433 U. S. 584 (97 SC 2861, 53 LE2d 982) (1977). Moreover, Pye could have asked the questions himself and, in fact, did so in some instances. Therefore, any error was harmless. *Robinson v. State*, 238 Ga. 291, 292 (2) (232 SE2d 561) (1977).

3. Pye urges that the trial court conducted an inadequate investigation into the possible misconduct of alternate juror Alvin Yarbrough. The record shows that, after the jury was seated, two jurors informed the trial court that, on the first day of voir dire, Yarbrough had commented that he was the victim's cousin. The trial court then questioned Yarbrough, who responded that, when he heard the victim's name announced, he said that he was the victim's cousin only because they had the same last name. Yarbrough stated that he was not related to the victim and did not know her. The trial court

allowed Yarbrough to remain an alternate juror, and informed the two concerned jurors that it had ascertained that Yarbrough was not related to the victim. Pye did not object to the investigation conducted by the trial court or request further investigation. *Bowens v. State*, 217 Ga. App. 283 (457 SE2d 238) (1995). Moreover, any error was harmless because Yarbrough was not needed to replace any regular jurors and, therefore, did not participate in deliberations or influence the verdict. *State v. Newsome*, 259 Ga. 187, 188 (2) (378 SE2d 125) (1989).

### The Guilt-Innocence Phase of Trial

4. The evidence presented at trial authorized the jury to find the following: Pye had been in a sporadic romantic relationship with the victim, Alicia Lynn Yarbrough, but, at the time of her murder, Ms. Yarbrough was living with another man, Charles Puckett. Pye and two companions, Chester Adams and Anthony Freeman, planned to rob Puckett because Pye had heard that Puckett had just collected money from the settlement of a lawsuit. Pye was also angry because Puckett had signed the birth certificate of a child whom Pye claimed as his own.

The three men drove to Griffin in Adams' car and, in a street transaction, Pye bought a large, distinctive .22 pistol. They then went to a party where a witness observed Pye in possession of the large .22. Just before midnight, the three left the party and drove toward Puckett's house. As they were leaving, a witness heard Pye say, "it's time, let's do it." All of the men put on the ski masks which Pye had brought with him, and Pye and Adams also put on gloves.

They approached Puckett's house on foot and observed that only Ms. Yarbrough and her baby were home. Pye tried to open a window and Ms. Yarbrough saw him and screamed. Pye ran around to the front door, kicked it in, and held Ms. Yarbrough at gunpoint. After determining that there was no money in the house, they took a ring and a necklace from Ms. Yarbrough and abducted her, leaving the infant in the house. The men drove to a nearby motel where Pye rented a room using an alias. In the motel room, the three men took turns raping Ms. Yarbrough at gunpoint. Pye was angry with Ms. Yarbrough and said, "You let Puckett sign my baby's birth certificate."

After attempting to eliminate their fingerprints from the motel room, the three men and Ms. Yarbrough left in Adams' car. Pye whispered in Adams' ear and Adams turned off onto a dirt road. Pye then ordered Ms. Yarbrough out of the car, made her lie face down, and shot her three times, killing her. As they were driving away, Pye tossed the gloves, masks, and the large .22 from the car. The police

later recovered these items and found the victim's body only a few hours after she was killed. A hair found on one of the masks was consistent with the victim's hair, and a ballistics expert determined that there was a 90 percent probability that a bullet found in the victim's body had been fired by the .22. Semen was found in the victim's body and DNA taken from the semen matched Pye's DNA. When Pye talked to the police later that day, he stated that he had not seen the victim in at least two weeks. However, Freeman confessed and later testified for the State.

The evidence was sufficient to enable a rational trier of fact to find proof of Pye's guilt of malice murder, kidnapping with bodily injury, armed robbery, rape, and burglary beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find that Pye's commission of kidnapping with bodily injury, armed robbery, rape, and burglary were aggravating circumstances which supported his death sentence for the murder.

5. Freeman's inculpatory testimony was corroborated by other evidence that Pye was seen with the murder weapon shortly before the victim was killed, that Pye lied to the police when first questioned about the victim's death, and that Pye had previously threatened the victim's life. This evidence was sufficient to corroborate the testimony of an accomplice as required by OCGA § 24-4-8. *Castell v. State*, 250 Ga. 776, 780 (1) (c) (301 SE2d 234) (1983).

6. The deputy who first discovered the victim's body testified that she recognized the victim. Pye asked the deputy how she knew the victim, but the State objected that Pye was attempting to introduce the victim's irrelevant cocaine use. The trial court twice ruled that Pye could not introduce evidence of the victim's cocaine habit until he had shown it to be relevant. When the trial court made these rulings, there had been no evidence that the victim's use of drugs played any part in her death. Later, however, Pye testified that he rented the motel room to sell drugs, that Adams and Freeman showed up with the victim, and that the victim willingly traded sex for crack cocaine and left with Adams and Freeman. Pye contends that the trial court erroneously refused to allow him to corroborate his subsequent testimony by presenting evidence of the victim's cocaine habit and of her willingness to trade sex for cocaine.

The trial court did not preclude all inquiry by Pye concerning the victim's cocaine habit. Compare *Hines v. State*, 249 Ga. 257, 260 (2) (290 SE2d 911) (1982). It merely limited cross-examination into that topic until Pye had shown its relevance. See *Cofield v. State*, 247 Ga. 98, 111 (6) (274 SE2d 530) (1981); *Crawford v. State*, 154 Ga. App. 362, 363 (2) (268 SE2d 414) (1980). Indeed, the trial court specifically told Pye that he could pursue the subject of the victim's cocaine habit

and willingness to trade sex for cocaine if there was evidence that cocaine was in her system when she died, or if Pye testified about an exchange of sex for drugs. After Pye's testimony, however, he made no further attempt to develop any evidence in this regard. Since the trial court did not deprive Pye of the opportunity to establish his version of the events, we find no error. *Goodwin v. State*, 208 Ga. App. 707 (1) (431 SE2d 473) (1993); *Harris v. State*, 196 Ga. App. 304, 306 (3) (396 SE2d 288) (1990).

7. Pye also contends that the trial court erred by admitting evidence of two prior incidents in which he threatened the victim. The trial court ruled that the two incidents were admissible to show motive. Pye argues that these incidents involving threats against the victim were irrelevant and prejudicial, since the State's theory at trial involved Pye's anger with Puckett for signing a birth certificate and Pye's attempt to rob Puckett.

> [E]vidence of the defendant's prior acts toward the victim, be it a prior assault, a quarrel, or a threat, is admissible when the defendant is accused of a criminal act against the victim, as the prior acts are evidence of the relationship between the victim and the defendant and may show the defendant's motive, intent, and bent of mind in committing the act against the victim which results in the charges for which the defendant is being prosecuted.

*Wall v. State*, 269 Ga. 506, 509 (7) (500 SE2d 904) (1998). There is no longer any requirement for the State to provide pretrial notice to the defendant of its intent to proffer such evidence of prior difficulties between the defendant and the victim or for the trial court to make the analysis formerly required by *Maxwell v. State*, 262 Ga. 73 (2) (414 SE2d 470) (1992). *Wall v. State*, supra at 507 (2). That Pye previously threatened the victim with a handgun and threatened to kill her if she began a relationship with another man was probative evidence of their relationship and of Pye's motive and bent of mind. The State's theory of revenge and attempted robbery against Puckett explains Pye's assault on the Puckett house, but does not foreclose the admission of additional evidence to explain Pye's subsequent violence against the victim.

8. Pye urges that the State impermissibly introduced evidence of a polygraph test to bolster Puckett's testimony. On direct examination, Puckett volunteered that the police gave him a lie detector test. The State did not seek to elaborate, and Pye did not object. The State's subsequent passing reference to the fact that Puckett had testified that he was given a polygraph test again prompted no objection from Pye. Thus, Pye waived his right to enumerate error on appeal

by failing to object to any mention of the lie detector test at trial. *Fargason v. State*, 266 Ga. 463, 464 (2) (467 SE2d 551) (1996).

9. Pye contends that the State twice impermissibly placed his character into evidence. In one instance, Puckett testified on cross-examination that Pye was in jail when Puckett's baby was conceived. Defense counsel did not object, move to strike the testimony, or request curative instructions. Therefore, we will not consider this instance of alleged impermissible placement of Pye's character into evidence. *Houston v. State*, 180 Ga. App. 267 (1) (349 SE2d 228) (1986); *Davis v. State*, 135 Ga. App. 584, 586 (2) (218 SE2d 297) (1975).

The second instance occurred after Pye testified that he was a drug dealer and that he had rented the motel room in order to sell drugs the night the victim was killed. When the State asserted that Pye thereby placed his character into evidence, the trial court erroneously permitted the State to reopen its case and introduce Pye's prior convictions for burglary and entering an automobile. *Jones v. State*, 257 Ga. 753, 760 (2) (363 SE2d 529) (1988). However, the trial court later recognized its error and, at length, instructed the jury to disregard Pye's prior convictions. Pye did not object to these curative instructions, request additional instructions, or move for a mistrial thereafter. Thus, this issue has not been preserved for appellate review. *Weems v. State*, 268 Ga. 515, 516 (2) (491 SE2d 325) (1997); *Woodham v. State*, 263 Ga. 580, 582 (3) (439 SE2d 471) (1993).

10. Pye further contends that the State improperly bolstered Freeman's trial testimony when a police witness testified about Freeman's prior statement. However, the defense had already used the very same statement to cross-examine Freeman and to attack his veracity. Therefore, the State was at liberty to bring out the remainder of Freeman's statement. *Legare v. State*, 243 Ga. 744, 757 (20) (257 SE2d 247) (1979); *Lowe v. State*, 97 Ga. 792, 794 (3) (25 SE 676) (1896). See also *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998).

11. Pye claims that the State used information never introduced into evidence to obtain his conviction, and that he was therefore unable to confront all the evidence against him. The State's fiber expert testified about fibers from Pye's clothes that were consistent with fibers found on other articles of clothing. The State did not introduce all of the articles of clothing into evidence at trial, but all of the clothing was available to Pye for cross-examination and inspection. At the conclusion of the fiber expert's testimony, the State asked the trial court if the expert could take the clothing back with him to the lab because the State needed it for Adams' upcoming murder trial. The trial court agreed after Pye's counsel stated that he had no objection to the expert taking the clothing with him. Therefore, Pye

waived any objection to the absence of a formal introduction into evidence of all of the actual clothing. See *Spencer v. State*, 260 Ga. 640, 646 (8) (398 SE2d 179) (1990); *Wilkie v. State*, 153 Ga. App. 609, 611 (4) (266 SE2d 289) (1980); *Clayton v. State*, 149 Ga. App. 374, 375 (1) (254 SE2d 495) (1979); *Savannah Elec. Co. v. Lowe*, 27 Ga. App. 350, 352 (5) (a) (108 SE 313) (1921).

12. Pye contends that the trial court erred in admitting into evidence a photograph of the victim taken while she was alive. "The general rule is that it is not error to admit a photograph of the victim while in life." *Ledford v. State*, 264 Ga. 60, 66 (14) (439 SE2d 917) (1994). Pye did not object when the victim's boyfriend identified the photograph. Under these circumstances, we find no error. *Garcia v. State*, 267 Ga. 257 (2) (477 SE2d 112) (1996).

13. Pye urges that the State used scientific evidence that was inherently unreliable. Specifically, he complains that the use of DNA, hair comparison, fiber comparison, and plaster tire track comparison evidence led to a conviction by mathematical odds.

All of the experts who testified were properly qualified as expert witnesses by the trial court and Pye had no objection to any witness' qualification. *Harper v. State*, 249 Ga. 519, 533 (10) (292 SE2d 389) (1982). Furthermore, "[o]nce a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." *Harper v. State*, supra at 526 (1). See also *Lattarulo v. State*, 261 Ga. 124, 126 (3) (401 SE2d 516) (1991). The scientific evidence introduced in this case was not novel, and has been widely accepted in Georgia courts. With regard to the DNA evidence, the trial court made the determination required by *Caldwell v. State*, 260 Ga. 278, 286-287 (1) (b) (393 SE2d 436) (1990) that the general scientific principles and techniques involved in DNA testing were valid and capable of producing reliable results, and that the DNA tester had performed the testing procedures in an acceptable manner. *Johnson v. State*, 264 Ga. 456, 458 (5) (448 SE2d 177) (1994). Pye did not object at trial that any of the scientific evidence was unreliable, or that any testing procedures were improper. Therefore, he may not raise these issues for the first time on appeal. *Harper v. State*, supra at 533 (10).

14. Pye contends that the State improperly commented upon his right to remain silent and his right to counsel in violation of *Doyle v. Ohio*, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976). *Doyle* holds that, after a defendant has received *Miranda* warnings, the State's use of his silence to impeach him violates due process. *Lee v. State*, 262 Ga. 593, 594 (2) (423 SE2d 249) (1992). However, where, as here, a defendant is not silent but makes a statement, the State can impeach his trial testimony with inconsistencies or omissions in his

pre-trial statement. *McMichen v. State*, 265 Ga. 598, 606 (11) (a) (458 SE2d 833) (1995); *Lee v. State*, supra. The trial court correctly permitted the State to cross-examine Pye about the dramatic difference between his trial testimony and his pre-trial statement.

During Pye's cross-examination, he volunteered that his own lawyer was responsible for the failure to correct his pre-trial statement and to reveal some exculpatory information until trial. *Jackson v. State*, 231 Ga. 664, 665 (2) (203 SE2d 535) (1974). Defense counsel did not object to the State's cross-examination and, on redirect, further questioned Pye about his reasons for not giving police the information before trial. " ' "A party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." (Cit.)' [Cit.]" *Warbington v. State*, 267 Ga. 462, 463 (2) (479 SE2d 733) (1997). Accordingly, even if the State had made an improper comment on Pye's right to counsel, the failure to raise an objection would preclude a finding of reversible error. *Warbington v. State*, supra.

15. Pye also contends that the State's closing argument during the guilt-innocence phase was improper. However, Pye did not object to any portion of the closing argument.

> When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial. [Cit.]

*Todd v. State*, 261 Ga. 766, 767 (2) (a) (410 SE2d 725) (1991). We find no error sufficient to overcome Pye's procedural default.

16. Pye urges that the trial court gave an improper sequential charge in violation of *Edge v. State*, 261 Ga. 865, 867 (2) (414 SE2d 463) (1992). The holding in *Edge* was designed to prevent juries from finding a defendant guilty of felony murder before considering the possibility of his guilt for voluntary manslaughter. In this case, the trial court ruled, and Pye agreed, that a charge on voluntary manslaughter was not authorized by the evidence. *Thornton v. State*, 264 Ga. 563, 569 (5) (f) (449 SE2d 98) (1994). The trial court's charge, as given, merely required the jury initially to consider the offense of malice murder and to consider felony murder only if it first found that Pye was not guilty of malice murder. This charge did not violate the holding of *Edge. Lattimore v. State*, 265 Ga. 154, 155 (2) (454 SE2d 496) (1995).

## The Sentencing Phase of Trial

17. Pye contends that the State improperly cross-examined his sister about their other brothers' convictions. On direct examination, Pye's sister testified that her brothers were often accused of doing things that they did not do. This testimony opened the door to questions about their other brothers' crimes, and the State was entitled to a thorough and sifting cross-examination on this issue. OCGA § 24-9-64; *Parker v. State*, 256 Ga. 543, 549 (7) (350 SE2d 570) (1986); *Felker v. State*, 252 Ga. 351, 382 (18) (314 SE2d 621) (1984).

18. Pye further contends that the State's attorney "testified" by asking two improper, prejudicial questions on cross-examination. When the witness did not answer the first question, the prosecutor withdrew it. Thereafter, the trial court sustained Pye's objection and Pye requested no further action. After an objection to an improper question or argument is sustained, there is no reversible error absent a request from the complaining party for further corrective action. *Phillips v. State*, 230 Ga. 444 (1) (197 SE2d 720) (1973); *Garner v. State*, 199 Ga. App. 468, 469 (2) (a) (405 SE2d 299) (1991). As to the second question, Pye did not object and, thus, we will not consider it on appeal. *Mundy v. State*, 259 Ga. 634, 635 (4) (385 SE2d 666) (1989).

19. Pye also contends that the prosecutor made improper closing arguments. Counsel for the State commented on future dangerousness by arguing that Pye would kill a prison guard in order to escape. The issue of a defendant's future dangerousness is relevant in the sentencing phase. *McClain v. State*, 267 Ga. 378, 383 (3) (a) (477 SE2d 814) (1996). The State is allowed considerable latitude in imagery and illustration in making its argument. *Philmore v. State*, 263 Ga. 67, 69 (3) (428 SE2d 329) (1993). That Pye could harm a prison guard is a reasonable inference, considering that he had been convicted of several violent crimes, including murder.

The prosecutor also argued that Pye was sorry that he did not kill Freeman so that Freeman could not "put the finger on him," and that, if Pye's lawyer had been present on the night of the murder and had tried to talk Pye out of killing the victim, "the only difference that it would have made is that there would have been two bodies instead of one," defense counsel's and the victim's. The thrust of this argument was that Pye showed no mercy during the murder, but was intent on killing the victim, and that he showed no remorse, but was sorry only that he had left an eyewitness alive. It is not improper to argue a defendant's lack of remorse or his failure to show the victim mercy. See *Carr v. State*, 267 Ga. 547, 559 (8) (d) (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582, 592 (18) (c) (458 SE2d 799) (1995). Although the State used violent imagery, it did not exceed its

considerable latitude in illustrating its argument. See *Philmore v. State*, supra. Moreover, Pye made no objection to any part of the State's argument, and there is no reasonable probability that the argument, even if improper, changed the result of the sentencing phase. *Todd v. State*, supra at 767 (2) (a).

20. Pye complains of the trial court's instructions regarding the jury's consideration of aggravating and mitigating circumstances. After reviewing the charge in the sentencing phase, we conclude that it was proper. See *Ledford*, supra at 69 (20); *Fugate v. State*, 263 Ga. 260, 262 (5) (431 SE2d 104) (1993).

21. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). Also, the death sentence is not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, as all involve a deliberate killing during the commission of kidnapping with bodily injury, rape, armed robbery, or burglary.

*Judgments affirmed. All the Justices concur, except Fletcher, P. J., who concurs specially.*

APPENDIX.

*Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Ward v. State*, 262 Ga. 293 (417 SE2d 130) (1992); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988).

FLETCHER, Presiding Justice, concurring specially.

Because the prosecutor's closing arguments in the sentencing phase included statements about Pye's future dangerousness that were not based on evidence in the record, I cannot agree with Division 19 of the majority opinion.

While a defendant's future dangerousness may be the subject of proper argument in the sentencing phase, this argument is only proper so long as it is "based on evidence adduced at trial."[2] The requirement that a prosecutor's argument in the sentencing phase of a death penalty trial be based upon facts of record is long-standing.

---

[2] *Ross v. State*, 254 Ga. 22, 34 (7) (326 SE2d 194), *cert. denied*, 472 U.S. 1022 (105 SC 3490, 87 LE2d 623) (1985).

In *Conner v. State*,[3] this Court held that the prosecutor's statement that Conner was the first defendant against whom he had sought the death penalty was improper because it was not based on facts in evidence. Similarly, this Court stated in *Horton v. State*[4] that, even though it was common knowledge that the death penalty had seldom been imposed in recent years, the prosecutor should not have referred to this fact since it was not in evidence.

The prosecutor's argument that Pye would kill a prison guard was not a reasonable inference from any evidence in the record. Although the state claims in its brief that such statements are supported by the record, the state has failed to provide a single citation to the record. That Pye had been convicted in this case of the murder, rape, and kidnapping of his former girlfriend does not make the murder of a prison guard "probable future behavior."[5] Although the murder was heinous, its facts are not suggestive of Pye's behavior in prison. This case is unlike *Spencer v. State*,[6] in which this Court upheld the prosecutor's argument that the death penalty was appropriate because Spencer was an escape risk. In that case, the facts showed that Spencer had committed the murder for which he was on trial in an attempt to escape from law-enforcement officers.

The majority's ruling will have dramatic impact not just on arguments, but also on evidence in the sentencing phase. In *Skipper v. South Carolina*,[7] the United States Supreme Court unanimously agreed that where the prosecution relies on the defendant's future dangerousness to argue for the imposition of the death penalty, elemental due process requires that the defendant be offered an opportunity to introduce evidence on this point. Therefore, if the state is permitted to speculate wildly in closing argument about the defendant's threat to prison guards, the defendant is constitutionally entitled to reopen the evidence to rebut this argument. Thus, sentencing trials will now routinely include witnesses to testify about the defendant's current behavior in prison,[8] expert witnesses to testify about the defendant's probable behavior in prison, and corrections personnel to testify about security in prisons holding inmates serving sentences of life or life without parole.[9] Thus, this opinion will fur-

---

[3] 251 Ga. 113, 122-123 (6) (303 SE2d 266), *cert. denied*, 464 U.S. 865 (104 SC 203, 78 LE2d 177) (1983).

[4] 249 Ga. 871, 876 (295 SE2d 281) (1982), *cert. denied*, 459 U.S. 1188 (103 SC 837, 74 LE2d 1030) (1983).

[5] See *Ross*, 254 Ga. at 34 (7).

[6] 260 Ga. 640, 653 (398 SE2d 179) (1990), *cert. denied*, 500 U.S. 960 (111 SC 2276, 114 LE2d 727) (1991).

[7] 476 U.S. 1, 5, n.1, 10-11 (106 SC 1669, 90 LE2d 1) (1986).

[8] *Skipper*, 476 U.S. 1 (reversing death sentence where trial court excluded testimony of jailers and a visitor regarding defendant's good behavior in jail).

[9] *Childs v. State*, 257 Ga. 243, 249, 255 (357 SE2d 48) (psychologist testified in sentenc-

ther the expenditure of time, resources, and testimony on issues not related directly to the particular defendant, the crime committed, or the appropriate punishment for that crime.

I further disagree with the conclusion that the statements that Pye wished he had killed Freeman and would have killed his own lawyer are reasonable inferences from the record. The state has pointed to no evidence in the record of any threats Pye made against Freeman or Pye's lawyer. Additionally, the majority's reliance on *Philmore v. State*[10] to justify such latitude in the argument is unpersuasive because that case was not a death penalty case.

Although the speculative arguments made by the prosecutor in this case are objectionable and should not be permitted, the defendant raised his objections only on appeal. Therefore, reversible error may be found only if there is a reasonable probability that the improper argument changed the result in the sentencing phase.[11] I concur in the majority's conclusion that Pye has not satisfied this high standard.

DECIDED SEPTEMBER 21, 1998.

*Johnny B. Mostiler,* for appellant.

*William T. McBroom III, District Attorney, Daniel A. Hiatt, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Wesley S. Horney, Beth Attaway, Assistant Attorneys General,* for appellee.

---

ing phase that in prison setting Childs would not be a problem; warden testified that Childs would be sent to maximum security prison), *cert. denied,* 484 U.S. 970 (108 SC 467, 98 LE2d 406) (1987).

[10] 263 Ga. 67, 69 (3) (428 SE2d 329) (1993).

[11] *Todd v. State,* 261 Ga. 766, 767 (2) (a) (410 SE2d 725) (1991), *cert. denied,* 506 U.S. 838 (113 SC 117, 121 LE2d 73) (1992).