Alexander E. WILLIAMS, IV, Petitioner-Appellant,

v.

Frederick J. HEAD, Warden, Respondent-Appellee.

No. 97-8983.

United States Court of Appeals,

Eleventh Circuit.

Aug. 26, 1999.

Appeal from the United States District Court for the Southern District of Georgia. (No. 92-209-CV-1), Dudley H. Bowen, Jr., Judge.

Before ANDERSON, Chief Judge, and CARNES and BARKETT, Circuit Judges.

CARNES, Circuit Judge:

Alexander Williams is a Georgia death row inmate. We have previously addressed and disposed of most of his appeal from the denial of his 28 U.S.C. § 2254 petition. *See Williams v. Turpin,* 87 F.3d 1204 (11th Cir.1996). Our prior decision summarizes some of the facts relating to his crime and gives a fairly detailed account of the procedural history of the case up to that point. Assuming familiarity with that opinion we will not duplicate everything said there, but we will set the stage for this opinion by summarizing briefly what we did in the earlier one.

In our previous opinion we affirmed the denial of habeas relief to Williams as to all but one of the claims relating to his conviction and sentence. The sole exception was Williams' claim that his trial counsel, an attorney named O.L. Collins, had rendered ineffective assistance at the guilt and sentence stages of the trial. That claim was first raised by another attorney, Richard Allen, who represented Williams at a motion for new trial hearing in state court. *See Williams,* 87 F.3d at 1206-07. The state courts rejected the claim on the merits. *See Williams v. State,* 258 Ga. 281, 286-90, 368 S.E.2d 742, 747-50 (1988).

Although Williams has not explicitly abandoned the ineffective assistance claim relating to the guilt stage or to other aspects of counsel's performance at the sentence stage, the principal thrust of his argument is the ineffective assistance claim relating to the investigation and presentation of mitigating evidence at the

sentence stage. That claim led to our remand and to the evidentiary hearing that followed. To the extent Williams still contends that attorney Collins rendered ineffective assistance in any regard other than the investigation and presentation of mitigating circumstances at sentence stage, we affirm the district court's rejection of that claim for the reasons stated in the district court's pre-remand opinion and in the state court opinions dealing with those issues.

We also conclude, as Williams' present counsel seem to recognize, that his claim that trial counsel Collins rendered ineffective assistance regarding mitigating circumstances cannot succeed *if* the only evidence considered is that which attorney Allen presented to support that claim in the new trial hearing. *See Williams v. State,* 258 Ga. at 289-90, 368 S.E.2d at 750. Instead of relying on the new trial hearing record, Williams' present counsel have brought forward a substantial amount of new evidence which they say should have been considered by the district court in deciding whether trial counsel Collins was ineffective at the sentence stage.

As we explained in our prior opinion, the additional evidence in question may be considered in this federal habeas proceeding only if Williams can show cause and prejudice for failing to present the evidence in the new trial hearing in state court. *See Williams,* 87 F.3d at 1208 (citing *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 11-12, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992)). Williams' sole theory of cause to excuse his failure to present this evidence at the hearing on the motion for new trial is that his attorney there, Richard Allen, rendered ineffective assistance in connection with that proceeding. That is the issue the present appeal turns on. We recognized in our earlier opinion that a Georgia capital defendant has a right to effective assistance of counsel in a new trial proceeding, which is where ineffective assistance claims are decided under Georgia's Unified Appeal Procedure. *See Williams,* 87 F.3d at 1209-10.

Accordingly, we remanded the case to the district court with instructions for it to examine the evidence Williams proffered about Allen's performance in connection with the new trial proceeding. The court was to determine whether the evidentiary proffer about Allen's performance was sufficient to support a finding of cause and prejudice for the failure to present in the new trial proceeding the additional evidence

2

that trial counsel (Collins) had rendered ineffective assistance at the sentence stage of the trial. If the district court found the proffer sufficient, it was to hold an evidentiary hearing on the cause and prejudice issues. And if it found cause and prejudice, the district court was then to consider the new evidence relating to Collins' performance and decide whether Collins had rendered ineffective assistance at the sentence stage. *See Williams,* 87 F.3d at 1211.

On remand, the district court skipped the question about the adequacy of the proffer and proceeded with an evidentiary hearing on the cause and prejudice issues. After hearing testimony from Allen and considering all of the evidence the parties wished to present, the district court found that Williams had failed to show Allen's performance in the new trial proceeding had been ineffective; therefore, the court concluded that Williams had not established cause for his failure to present in that proceeding the additional evidence relating to Collins' sentence stage performance. For that reason, the district court did not consider the additional evidence in deciding whether Collins had rendered ineffective assistance at sentencing, and the court reiterated its rejection of that claim and its denial of Williams' habeas petition.

We now review the district court's decision that Allen did not render ineffective assistance in his representation of Williams in connection with the new trial motion. Our review of the district court's legal holdings and ultimate conclusion is *de novo,* but we review its findings of fact only for clear error. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). Before getting to the specific facts involving Allen's performance at the new trial hearing, some preliminary matters need to be discussed.

**THE OPERATIVE PRESUMPTION**

One preliminary matter involves the lens through which we view ineffective assistance claims. In the seminal decision on modern ineffective assistance law, the Supreme Court instructed us that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065. Not only that, but "a court must indulge a strong presumption that counsel's conduct falls within the wide

3

range of reasonable professional assistance." *Id.* More specifically, courts should "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

Speaking en banc, we have explained that "[b]ecause constitutionally acceptable performance is not narrowly defined, but instead encompasses a 'wide range,' a petitioner seeking to rebut the strong presumption of ineffectiveness bears a difficult burden." *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc). That is why " 'the cases in which habeas petitioners can prevail on ineffective assistance claims are few and far between,' " *id.* at 1511 (quoting *Rogers v. Zant,* 13 F.3d 384, 386 (11th Cir.1994)), and "[c]ases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between." *Spaziano v. Singletary,* 36 F.3d 1028, 1039 (11th Cir.1994).

The strong presumption that counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment is particularly important in this case. The district court found attorney Allen's recollection of the relevant events, which occurred ten years before he testified at the federal evidentiary hearing, was severely hampered by the loss of his case file. After the new trial proceeding and appeal, Allen turned the file over to someone else who was to represent Williams thereafter and the file was lost. It has never been found.[1] Allen explained that he could not recall many of his thought processes concerning the case, which is understandable. As the district court vividly described Allen's situation, "It's like asking somebody to put a blindfold on and grope around in a dark room where they had been maybe ten years ago to recall what he did or did not do."

Given the passage of so much time, and without his file, Allen's testimony in the district court was, in that court's words, "guarded and, understandably, he often hedged his answers," expressing an

---

[1]Allen could not recall to whom he had given the file a decade earlier, and present counsel for Williams said they did not receive it. After making every effort to have the file produced, the district court resolved the credibility issue by finding that "Allen turned his file over to someone on Williams' legal team," a finding that is not clearly erroneous. It appears to be undisputed that the file cannot be found.

"unwillingness to speculate about what he might have done or not done, heard or not heard, and his recollection of specific details was often hazy, which is also understandable." Recognizing the strength and applicability of the presumption that counsel rendered effective assistance, the district court correctly refused to "turn that presumption on its head by giving Williams the benefit of the doubt where it is unclear what Allen did or did not do because Allen turned his file over to someone on Williams' legal team." Following the Supreme Court's instructions, we will "indulge a strong presumption that [Allen's] conduct falls within the wide range of reasonable professional assistance," and that he "made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 689-90, 104 S.Ct. at 2065-66. That means where the record is incomplete or unclear about Allen's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.

### ALLEN'S EXPERIENCE AND THE EXPERIENCED HELP THAT HE RECEIVED

Another preliminary matter involves attorney Allen's experience and the assistance he received from two capital case defense experts. Allen is a Vanderbilt graduate who earned his law degree from Emory in 1966. At the time he represented Williams in the new trial motion hearing in 1987, Allen had more than twenty years of legal experience, which included having served for eight years as District Attorney for the circuit in which this case arose. He had been involved in several capital cases, and he had previously served as lead counsel in capital cases, albeit on the prosecution side. A large percentage of Allen's work and experience, between fifty and seventy-five percent of it, had been in criminal cases. The district court observed that Allen had a good reputation and standing in the profession.

Not only was Allen an experienced criminal defense attorney, but in his effort to win a new trial for Williams he sought out and received assistance from two of the foremost experts in capital defense work in the country. He talked "on numerous occasions" with Stephen Bright of Atlanta, who helped Allen keep up

5

with the latest developments in the law as he was preparing for the new trial hearing and direct appeal.[2] Allen

also "consulted at considerable length with George Kendall" about this case.[3] Allen discussed with Kendall

the representation that Collins had rendered and other matters; for example, he specifically recalled talking

with Kendall before he went to interview Williams in order to get Kendall's advice about "what we needed

to cover and things of that nature."

"Our strong reluctance to second guess strategic decisions is even greater where those decisions were

made by experienced criminal defense counsel." *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th

Cir.1998). *Accord, e.g., Spaziano,* 36 F.3d at 1040 ("[T]he more experienced an attorney is, the more likely

it is that his own experience and judgment in rejecting a defense without substantial investigation was

reasonable under the circumstances.") (quoting *Gates v. Zant,* 863 F.2d 1492, 1498 (11th Cir.1989)); *Birt*

*v. Montgomery,* 725 F.2d 587, 600 (11th Cir.1984) (en banc). It matters to our analysis that Richard Allen

is an experienced criminal defense attorney. It is also relevant that he consulted with two noted experts in

---

[2]Mr. Bright is a nationally known expert who has been litigating against the death penalty for twenty years. He has taught on that and related subjects at Harvard, Yale, Georgetown, Emory and other universities, has written numerous law review articles on the subject, and has testified extensively about it before committees of Congress and many state legislatures. For his efforts and dedication, Mr. Bright was awarded the Roger Baldwin Medal of Liberty by the American Civil Liberties Union in 1991, the Kutak-Dodds Prize by the National Legal Aid & Defenders Association in 1992, and last year he received both the American Bar Association's Thurgood Marshall award and the Louis Brandeis Medal given by the Brandeis Scholars at Brandeis School of Law at the University of Louisville. *See* Kim Wessel, *Lawyer for the Condemned Stephen Bright Wins Law Group's Brandeis Medal,* Courier-Journal (Louisville, Ky.), March 13, 1998, at 4B; Stephen B. Bright, *Death in Texas,* The Champion, July 1999, at 16.

[3]Mr. Kendall is another nationally known, expert litigator against the death penalty. He has served as Staff Attorney for the ACLU Eleventh Circuit Capital Litigation Project in Atlanta and as staff attorney in the capital punishment project of the NAACP Legal Defense and Educational Fund. For more than a decade and a half, Kendall's practice has focused upon the litigation of capital cases at every step in the state and federal systems. He has personally litigated scores of capital cases in Alabama, Georgia, and Texas in both state and federal post-conviction proceedings, and he has argued capital sentence habeas cases in this and other circuit courts of appeal. Kendall routinely serves as a consultant for counsel handling capital trial and habeas matters in state and federal courts throughout the country. In 1995 he received the New York State Defenders Association Service of Justice Award. *See* Panel Discussion, *Reflections on a Quarter-Century of Constitutional Regulation of Capital Punishment,* 30 J. Marshall L.Rev. 389, 389 n.* * * (1997); *Reform of the Habeas Corpus Review Process: Hearing Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary* (Oct. 22, 1993) (statement of George H. Kendall).

the field of capital case litigation.

## THE FACTS RELATING TO THE REPRESENTATION

Williams was convicted of the kidnaping, robbery, rape, and murder of a sixteen-year-old girl. He "accosted the victim in the mall parking lot, forced her to accompany him to a secluded area where he raped and murdered her, then took her jewelry, her pocket book and her automobile, and used her credit cards the next day." *Williams v. State,* 258 Ga. at 282-83, 368 S.E.2d at 745. The evidence of Williams' guilt was overwhelming. *See id.* at 282, 368 S.E.2d at 745.

### *The Sentence Hearing*

The sentence hearing began the morning after the guilty verdict was returned. At that hearing, the only evidence the State presented was the testimony of a probation officer who told of Williams' involvement in the juvenile court system. Defense counsel Collins presented as a mitigation witness Williams' mother whose testimony humanized him to the jury to some extent. She told the jury about Williams: how he collected comic books and coins, how he was good-hearted, how he was religious, how he was a little stubborn and rebellious as a teenager but had never argued with her or talked back, and about how she had lost contact with her son because of the friends he had picked, and how she may have been too strict on him. Williams' mother asked the jury to spare her son's life.

Collins also presented as a mitigation witness a young woman who was a friend of Williams. She told the jury that Williams had been welcome in her home, and that her mother, stepfather, and sister knew him and approved of him. She told the jury she knew Williams well and he was incapable of committing such a violent crime. On August 29, 1986, the jury returned a death sentence verdict.

### *Allen's Appointment and the New Trial Motion and Amendments*

In accordance with Georgia's Unified Appeal Procedure, Collins was relieved from representing Williams in the new trial and direct appeal proceedings. Allen was appointed for that purpose in the Fall of 1986. On September 23, 1986, Allen filed a skeletal motion for new trial, as was his practice; having met

the filing deadline, he later supplemented that motion with two amendments. The new trial motion as initially filed consisted of five general grounds. On October 2, 1987, Allen filed the first amendment to the motion for new trial, which added 25 new and more specific grounds. His second amendment to the motion for new trial was filed on October 13, 1987, and it added two more grounds, one of which was a multi-part claim of ineffective assistance of counsel at the guilt and sentence stages. The motion as twice amended contained thirty grounds.

*Allen's Investigation, Preparation, and the Strategic Decisions that He Made*

The first thing Allen did when he began representing Williams was go through the trial record and transcript, and he did that "a great deal" during the more than a year between his appointment and the new trial motion hearing. Having read the transcript of the trial many times, Allen was aware of everything in it by the time of the hearing. He also obtained Collins' file and records about the case more than a year before the hearing.

Five weeks before the hearing on the motion for new trial, the Georgia Supreme Court released its decision in *Thompson v. State,* 257 Ga. 386, 359 S.E.2d 664 (1987), which held that, from the date that decision was published in the advance sheets, any ineffective assistance of counsel claim not raised in a motion for new trial proceeding would be deemed waived. That was a new way of handling such claims, which before then could have been raised for the first time in state habeas proceedings. Allen learned of the *Thompson* decision, perhaps from Bright or Kendall, and thereafter amended his motion to include a multi-part claim charging that Collins had been ineffective at the guilt and sentence stages.

The change in procedure announced in the *Thompson* decision caused Allen to raise the ineffective assistance claim in the new trial motion instead of saving it for the state habeas proceeding, but after so many years, he is understandably unsure exactly when he learned of the *Thompson* decision. Asked ten years later at the evidentiary hearing on remand in this case, Allen said that he guessed and assumed he had not learned of the *Thompson* decision before he filed the first amendment to the new trial motion, which was on October

8

2, 1987, but he was not sure that he had not known of the decision before then. The testimony of Collins at the hearing on the motion for new trial ten years earlier—and virtually contemporaneous with the event in question—indicates that Allen must have learned of the *Thompson* decision within a few days of its September 9, 1987 release date. Collins testified unequivocally at the October 14, 1987 hearing on the motion for new trial that Allen had told him "several weeks" before the hearing that he was going to amend the motion to raise the ineffective assistance claim. Allen did put a lot of work into that claim, although he waited until the day before the hearing to actually file the amendment raising it.

Allen testified that his preparation for this case was more detailed than in any other one like it with which he had been involved. He put so much time into the case that he agreed to cut his request for compensation because it appeared to be for an excessive amount.

In ground 29(b) of the amended motion for new trial, Allen asserted that Collins had rendered ineffective assistance of counsel by, among other things, failing to investigate, uncover and properly present evidence of mitigating circumstances at the sentence stage of the trial. In Allen's view, mitigating circumstances could be "[a]lmost anything." He thought that Collins had not made enough effort to present mitigating circumstances, and he set about to prove that there was mitigation evidence Collins could have presented but did not. Allen's goal was to find evidence of good things Williams had done or deprivations he had suffered which Collins had not presented at the sentence hearing, and for which Collins had no strategic or ethical reason not to present. He wanted to show that instead of making judgment calls about not presenting more in mitigation, Collins had simply overlooked available evidence of mitigating circumstances and had thereby rendered ineffective assistance.

Allen had Collins' file, and he interviewed Collins about the ineffective assistance claim. Although Allen could not recall the details of their conversation, he assumed that he talked with Collins about his preparation for the sentence hearing.

Allen talked with Williams at least once about the motion for a new trial, although he could not recall

9

when or the details of their conversation.[4] Allen did recall, however, the impression he formed of Williams. From what Collins had told Allen, he expected Williams to be hostile. Allen did not expect to meet an intelligent young man who was attentive, cooperative, and polite, but that is the way he found Williams to be. Williams was interested in what was happening, he asked intelligent questions and responded intelligently to Allen's questions, and they had no problem communicating. Williams did or said nothing to lead Allen to believe he might have any mental problems.

Allen assumes he asked Williams about his life. Williams did not tell him about any physical or sexual abuse he had suffered. Allen did not recall getting any information from anyone that would lead him to believe Williams had ever been abused. Nor did he recall ever hearing that Williams was obsessed with religion.

On October 7, 1987, a week before the new trial hearing, Allen called the Georgia Diagnostic & Classification Center "desiring information about [Williams'] family."

In his attempt to uncover mitigating circumstance evidence that Collins had not presented, Allen interviewed Patricia Blair, who is Williams' mother. Allen discussed Collins' lack of preparation with Ms. Blair. He questioned her in an attempt to find out any good acts Williams had done or any deprivation he had suffered, and he explored with her the possibility of medical or mental state mitigation. Unfortunately, the information Allen got from Ms. Blair was not very helpful. She gave Allen the names of some possible mitigating circumstance witnesses, and he talked with them and with at least one other person on his own. However, the reaction he got from those people was that they did not really know Williams and could not help by testifying either about good things he had done or deprivation he had suffered. Allen tried to develop something along those lines, but nothing worked out.

Allen did learn from Ms. Blair that Williams had been to Georgia Regional Mental Hospital for about

---

[4]Allen must have talked with Williams after he talked with Collins, because Allen recalls that when he met Williams his expectations were based upon what Collins had told him about Williams.

a week in 1985 in order to be evaluated.[5] Allen wanted to develop that fact into mitigating evidence of mental condition which he could get into evidence through Ms. Blair, since she was the one who had Williams sent there for the evaluation. She told Allen the reason she had sent Williams there was because she could not get him to mind her. Allen thought few teenagers did mind their parents and if that was why Williams went to Georgia Regional, it was not going to help much. Allen described Ms. Blair on that subject this way: "She was just as weak as she could be about that stuff, like he won't mind me. Every mother goes through that. I couldn't get much from her on his mental condition."

Nonetheless, Allen thought that Williams having been to Georgia Regional was something that Collins should have explored but had not. So, Allen called or went to see the superintendent of Georgia Regional, Dr. Everett Kuglar. Allen knew Dr. Kuglar and had worked with him on numerous occasions in the past. Allen spoke with him several times about this case in an effort to develop some mental state mitigating evidence that Collins had not used. Allen told Dr. Kuglar that in his opinion there had not been proper medical investigation in the case, and that he thought it should be pursued. Allen asked Dr. Kuglar to look into it and see if he could help on that issue. Given the passage of time, Allen could not recall exactly what information he gave Dr. Kuglar about Williams, but he knows they had several conversations and that Dr. Kuglar had the record of Williams' stay and evaluation at Georgia Regional.

After reviewing the records, Dr. Kuglar concluded that there was nothing to indicate Williams suffered from schizophrenia or had any other mental disorder, and nothing to indicate that another mental evaluation should be done. Allen recalled that Dr. Kuglar told him Williams was just a sociopath, or was anti-social, or something to that effect. Whatever the exact words Dr. Kuglar used, they caused Allen to decide not to ask the court to order a mental evaluation as part of the proceedings on the motion for new trial. If he had, any evaluation the court ordered would have been done at Georgia Regional, and Allen knew how

_____

[5]In her testimony at the hearing on the motion for new trial, Ms. Blair said the evaluation occurred in late 1985 or early 1986. One of the exhibits Williams has proffered shows that the evaluation occurred in April of 1985.

11

that would have come out. The report that came back, as Allen put it, would not have been "beneficial to the client." Instead, it would have hurt Williams to request another evaluation, because the result would have proven that Collins' failure to pursue that angle had not mattered.

So, Allen made a strategic decision not to request a mental evaluation of Williams, but to try and get what he could out of Collins' failure to discover that Williams had been sent to Georgia Regional. As Allen explained: "I thought it best to leave it with the court that here was something very obvious that Mr. Collins didn't inquire into. Because from my conversations with Dr. Kuglar I felt if I did take it a step further I probably wasn't going to like the results."

Allen could not recall all of the people he talked with during his preparation for the hearing on the motion for new trial. He had no recollection of having spoken with Williams' sister, Alexsandrya Bonner, but he is sure he must have learned about her. Allen did not talk to Alexander Williams III, who is Williams' father, because there was something Allen learned that led him to believe that doing so would not be helpful. According to Williams' mother, Williams and his father had not spent much time together. The record shows Williams spent only eight months with his father and that was when he was fourteen years old.

*The Hearing on the Motion for a New Trial*

At the hearing on the motion for a new trial, Allen followed his strategy in regard to the ineffective assistance of counsel claim against Collins. He called Collins as his first witness. Allen brought out from Collins that he had failed to request a psychiatric evaluation, and that Collins had been unaware Williams had once been sent to Georgia Regional, a mental facility. Allen tried to get Collins to admit that Williams behaved strangely, but Collins insisted that Williams was only stubborn. Collins testified that Williams was smarter than Collins in some areas and knew what was going on and did not need a psychiatric examination. Collins also said that Williams had indicated he would not cooperate in a mental examination, anyway. Allen asked Collins whether it had occurred to him Williams might have some mental problem that did not rise to the level of insanity but could be presented as a mitigating circumstance at sentencing. Collins stated that

12

although he was not an expert he thought he knew when a man was crazy. Allen brought out that Collins had no psychiatric or psychological training.

Allen also asked Collins when he had first sought the help of Williams' mother in finding mitigation witnesses, and Collins said he could not say. Collins claimed that he had gotten nothing useful from anything Williams or his mother had told him.

Throughout his direct examination of Collins, Allen asked him pointed questions about why he had made various statements during the guilt or sentence stage and why he had not objected to what seemed to Allen to be numerous instances of error. At one point during the hearing Collins expressed surprise at the "magnitude" of the ineffective assistance challenge, and at another point he responded sharply to Allen as follows: "Mr. Allen, let me ask you, are you fixing to have me retry this case with you, or are you going to talk about my ineffective assistance of counsel? What are you trying to do, sir?"

Allen also called Patricia Blair, Williams' mother, to testify in support of the claim that Collins had been ineffective at the sentence stage. She testified that Williams had been at the Georgia Regional mental facility in late 1985 or early 1986, and that she had never received a report from it. She also testified that she discussed with Collins the possibility of a mental evaluation of Williams, but he had told her the court would not order one.

Allen elicited from Ms. Blair testimony that she and Collins had not discussed the nature of her testimony at the penalty stage until the day before the trial began, when Collins told her he wanted her to get up and say something good about her son. Allen brought out that she had given Collins the names of people who could say good things about Williams, but Collins never mentioned the subject to her again until the evening before the penalty stage.

Allen obtained from Ms. Blair testimony that there were respectable people who could have come forward and testified at the sentence stage, including: Father Frank at St. Joseph's Baptist Church where she and Williams were members; Dorothy Thomas who works for Community Action and had known Williams

13

since he was a little boy;  George Bennett, a deacon at a different church;  and Ronnie Clemmons, who is Williams' brother-in-law.  Ms. Blair told the court that the reason none of those people had testified in mitigation at the sentence hearing is that she did not have enough time to contact them and did not know that she was supposed to do so.  In her words, she was "just asked at the last minute if I knew of anybody that would say something good on my boy's behalf."

### *The Denial Order and the Appeal*

Approximately a month after the hearing concluded, the state trial court issued a written order addressing the ineffective assistance claim and denying relief.  The court found that Collins was an experienced criminal defense attorney who had performed adequately, that the testimony of the additional mitigating circumstance witnesses named during the hearing would have been cumulative to the testimony of the two witnesses Collins had presented, and that the problems with the defense originated in Williams' own decisions and his refusal to cooperate with Collins.  In the same opinion in which it affirmed the conviction and sentence, the Georgia Supreme Court also affirmed the denial of the motion for new trial. *See Williams v. State,* 258 Ga. 281, 368 S.E.2d 742 (1988).

Thereafter, Williams' present counsel filed a petition for a writ of habeas corpus in the state trial court.  After an evidentiary hearing that petition was denied in a written opinion, and the Georgia Supreme Court denied a certificate of probable cause to appeal.  Present counsel then filed a petition for a writ of habeas corpus in the United States District Court.  The history of those proceedings to date has already been described in our prior opinion in this case and at the beginning of this opinion.

### DISCUSSION

Williams' present counsel begin their attack on the performance of attorney Allen by contending that he did not have sufficient time before the October 14, 1987 hearing on the new trial motion to investigate and prepare to present a claim that Collins had rendered ineffective assistance at the sentence stage.  They start with the premise that Allen could not reasonably have been expected to include such a claim in the motion

14

for a new trial until the Georgia Supreme Court changed the rules in that regard in its September 9, 1987 *Thompson* decision, and they add to it the district court's finding that Allen did not learn of that decision until October 2 or 3, 1987 at the earliest. Although we are somewhat dubious about the district court's finding that Allen did not learn of the *Thompson* decision, and thus did not begin preparing to present the ineffective assistance claim, before October 2, 1987,[6] we cannot say that finding is clearly erroneous. So, we accept it.

Allen worked hard on the ineffective assistance claim. Moreover, he had the entire trial and sentencing record for over a year, and during that time he had read it many times and had become thoroughly familiar with it. He also had Collins' case file for more than a year before the hearing. The district court noted that "most attorneys, whether solo or part of a law firm, work under tremendous time constraints, and short notice is a fact of life." *See also Rogers,* 13 F.3d at 387 ("lawyers do not enjoy the benefit of endless time"). The district court found as a fact that Allen used the time he had productively, and it declined to hold that the amount of time he had was insufficient as a matter of law. There is no evidence Allen worked on anything other than this case after he learned of the *Thompson* decision. We, like the district court, are quite unwilling to hold that eleven or twelve days is, as a matter of law, insufficient time to investigate and present an ineffective assistance claim. *See, e.g., Mills v. Singletary,* 161 F.3d 1273, 1285-86 (11th Cir.1998)

---

[6]Everyone agrees that it was not necessary for ineffective assistance claims to be raised in new trial motions before the release of the *Thompson* decision on September 9,1987, and before that date Allen quite reasonably did not contemplate presenting such a claim at the October 14, 1987 hearing. No one knows for sure exactly when Allen learned of the *Thompson* decision and began preparing the ineffective assistance claim. The district court assumed, as did Allen in his testimony ten years after the fact, that if Allen had been contemplating such a claim when he filed the first amendment to the new trial motion on October 2, 1987, he would have included the claim in that amendment.

The flaw in that assumption is that it ignores the need to investigate and prepare an ineffective assistance claim before stating it in a pleading. When Allen did finally amend the motion for a new trial a second time to include the ineffective assistance claim, he pleaded a specific claim with seven subparts. The district court's finding that Allen did not begin investigating the ineffective assistance claim until after the first amendment to the motion for new trial was filed on October 2, 1987 also ignores Collins' unequivocal testimony at the new trial motion hearing itself, which came ten years closer to the events in question, and virtually contemporaneous with them. Collins testified without contradiction that Allen had told him "several weeks" before the October 14, 1987 hearing of his intention to include an ineffective assistance claim in the new trial motion.

15

(attorney responsible for sentence stage presentation to the jury rendered effective assistance even though she was not hired for that purpose until a few days before the hearing).

Moreover, the claim presented is not that Allen should have asked for more time. Nowhere in their lengthy federal habeas petition did Williams' present counsel assert that Allen was ineffective for failing to request a continuance of the motion for new trial hearing in order to have more time to investigate and prepare his claim that Collins had rendered ineffective assistance at the sentence stage. Present counsel questioned Allen extensively at the evidentiary hearings in the state habeas proceeding and in this federal habeas proceeding. Yet never once did they ask Allen whether he thought he had sufficient time to investigate and prepare to present the claim, nor did they ever ask him why he did not request a continuance. Besides, there is no indication that such a request would have been granted. Accordingly, Williams failed to raise and develop in the district court any claim that Allen was ineffective for failing to request more time, and we focus instead on how he used the time he had.

*The Non-Mental State Mitigation Issues*

Williams' present counsel contend that Allen did not even interview Williams in search of mitigating circumstance evidence. They assert that the district court found that to be true, but it did not. The district court found that Allen had personally met with Williams at least once before the hearing on the new trial motion, but Allen was unsure exactly when that meeting took place. Although acknowledging that there is some evidence Allen did not personally meet with Williams during the week before the hearing, the district court did not find that Allen failed to talk with Williams about his life. As the district court summarized it, Allen could not recall ten years later the specifics of his conversation with Williams, but assumed he had asked him about his life, and "[t]here is *no* evidence that Allen did not ask Williams about his life." (emphasis in original) Williams' present counsel have neither proffered an affidavit from Williams nor presented any testimony from him suggesting that Allen failed to interview Williams about his life. Williams did not tell Allen he had suffered any physical or sexual abuse, and Allen did not get any information from Williams

16

suggesting he had ever been abused or was obsessed with religion.

As we noted at the outset, reconstructing the facts of Allen's investigation and preparation of mitigating circumstances is hampered in this case by the passage of time and the loss of Allen's file by Williams' present counsel. *See* 3778 - 3779, supra. This is a prototypical circumstance in which we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "recognize that counsel is strongly presumed to have rendered adequate assistance." *Strickland,* 466 U.S. at 689-90, 104 S.Ct. at 2065-66. As the district court so aptly put it, we should "not turn that presumption on its head by giving Williams the benefit of the doubt where it is unclear what Allen did or did not do because Allen turned his file over to someone on Williams' legal team." Given the lack of clarity of the record, we presume that Allen talked with Williams as part of his effort to ascertain whether there was any mitigating circumstance evidence that Collins had failed to present. We are comfortable with doing so because Allen is an experienced criminal defense attorney, and he regularly consulted with two of the premier experts in this field, Kendall and Bright. There is no reasonable possibility that Allen, guided and instructed as he was by Kendall and Bright, would have neglected to talk to his client about mitigating circumstances.[7]

In addition, it is undisputed that Allen interviewed Williams' mother, Patricia Blair, in an attempt to develop mitigating circumstance evidence Collins had overlooked. She came across to Allen as a nice lady who wanted to help her son. Allen discussed with her Collins' lack of preparation for the sentence stage, which Allen brought out through her testimony at the hearing on the motion for new trial. Before that hearing, Allen questioned her in an attempt to find out any good things Williams had done and any deprivation he had suffered at any time in his life. He tried to ascertain from her whether there was any basis

---

[7]The record indicates that Allen talked with Collins about Williams before Allen interviewed Williams. It also indicates that at the time Allen talked with Collins he told Collins he was planning to bring the ineffective assistance claim. It follows that Allen knew when he interviewed Williams that he would be bringing the ineffective assistance claim.

17

for medical or mental state mitigation. She was unable to give Allen much that was useful. He did what he could with what he got from her.

Ms. Blair gave Allen the names of people who could say good things about Williams, and Allen checked them out. To his disappointment, Allen found that those people did not know Williams well enough to say anything on his behalf. Nor could they provide testimony about any deprivation Williams might have suffered. There was also another person Allen talked to on his own, but that effort, too, was unfruitful.

Even though Allen found that those people could not testify to mitigating circumstances at the hearing on the motion for a new trial, he attempted to use their existence as an example of leads that Collins had not run down. At the hearing on the motion for a new trial, Ms. Blair testified that there were respectable people who could have come forward and testified on Williams' behalf at the sentence hearing if Collins had called them, and she gave their names and positions.

Williams' present counsel faults Allen for not interviewing Alexsandrya Bonner Clemmons, Williams' sister. She is the only one of Williams' four siblings whom present counsel contend could have provided useful information to Allen. Present counsel have proffered an affidavit from her alleging that Williams was mistreated by his mother and grandmother while growing up; the affidavit also says that when Williams was in jail for five months before this case arose, this sister visited him on one occasion and all he wanted to talk about then was religion. Allen could not recall having spoken with her.

Allen is also faulted for not having interviewed Williams' natural father in search of mitigating circumstance evidence overlooked by Collins. Allen thought, but was not sure, that the man was not available at the time. He recalled having learned that the father had not been around Williams much, and there may have been something else that also led Allen to believe there would be little point in talking to him. At the evidentiary hearing on remand, Williams' present counsel stated that the only time Williams had lived with his father was for a period of about eight months when he was fourteen years old. Allen responded that he could have heard that, but he did not recall.

18

Present counsel have proffered affidavits from Williams' father and sister which, if believed, indicate that they could have provided additional mitigating circumstance evidence if they had been called as witnesses. It is not surprising that they have done so. Sitting en banc, we have observed that "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called," but "the existence of such affidavits, artfully drafted though they may be, usually proves little of significance." *Waters,* 46 F.3d at 1513-14. Such affidavits "usually prove[ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." *Id.* at 1514.

This case is no exception. The record shows that the effort to prove that Allen, a sole practitioner, could have done better has been joined by four members of a large Atlanta law firm, a Florida lawyer with considerable experience in this area, a New York attorney, and others. With all of the resources and time they have devoted to the case, this squad of attorneys has succeeded in proving the obvious: if Allen had their resources and the time they have been able to devote to the case, he could have done better.

Even putting the overwhelming disparity of resources to the side, we have recognized that " '[i]n retrospect, one may always identify shortcomings,' but perfection is not the standard of effective assistance." *Id.* (quoting from *Cape v. Francis,* 741 F.2d 1287, 1302 (11th Cir.1984)). As we held in *Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992), "A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance." And in *Waters* we explicitly reiterated that: "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters,* 46 F.3d at 1514 (quotation and citation omitted); *accord, e.g., Provenzano,* 148 F.3d at 1333.

The Supreme Court has told us that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

19

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. The same reasonableness criterion and heavy deference apply to an attorney's decisions concerning the extent to which a possible guilt or sentence stage defense is pursued. *See Mills v. Singletary,* 63 F.3d 999, 1024 (11th Cir.1995) ("The question is whether ... ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (quotation and citation omitted); *Gates,* 863 F.2d at 1498 ("Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense."). In *Rogers v. Zant,* 13 F.3d at 387, we rejected the position that strategic decisions can be considered reasonable only if they are preceded by a "thorough investigation." Instead, we explained that the "correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Id.* We have also put it in other words, saying that to be effective a lawyer is not required to "pursue every path until it bears fruit or until all hope withers." *Foster v. Dugger,* 823 F.2d 402, 405 (11th Cir.1987) (quoting *Solomon v. Kemp,* 735 F.2d 395, 402 (11th Cir.1984)). And we held in *Mills,* 63 F.3d at 1021, that "[a] decision to limit investigation is accorded a strong presumption of reasonableness." (quotations and citations omitted).

Allen did not have endless time, energy, or financial resources. He did, however, put what he had into the motion for new trial that he litigated on behalf on Williams. At some point, Allen talked to Williams about his life, but Williams gave him no reason to suspect abuse and mistreatment. An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him. *See Porter v. Singletary,* 14 F.3d 554, 560 (11th Cir.1994) (counsel not ineffective for failing to discover sexual abuse which client did not mention); *see also, Lambrix v. Singletary,* 72 F.3d 1500, 1505-06 (11th Cir.1996) (counsel not ineffective for failing to discover evidence of abuse in childhood where the defendant and his relatives gave counsel no reason to believe that such evidence existed). Allen also interviewed Williams' mother in an effort to find leads to any kind of deprivation Williams might have

suffered. Although Allen thought she was cooperative and nice, and he judged that she wanted to help her son, he got nothing from her about Williams having been abused or mistreated. Finally, Allen also talked with the people whose names Ms. Blair gave him. But after all of those efforts to develop evidence of mitigating circumstances proved futile, Allen made the decision to expend his time and efforts elsewhere.

The district court found that it was reasonable for Allen to believe that Williams' father would not be helpful, considering that Williams had grown up apart from his father. The court also concluded that it was reasonable for Allen to think that there was little to be gained from interviewing Williams' sister, Alexsandrya, since nothing Allen had learned from Ms. Blair suggested that the sister might be more helpful than the mother. We afford Allen's decision a presumption of reasonableness and substantial deference, all the more so because of his considerable experience in criminal cases. *See* supra at 3779 - 3780.

Relying in part upon a treatise which lists family members as second after the defendant himself as a potential source of factual information about the defendant, the dissenting opinion asserts that the family is the most important source for such information. To the extent, if any, that either the treatise or the dissenting opinion would have us adopt a per se rule that it is always ineffective assistance for an attorney to fail to interview every member of the defendant's family for possible mitigating circumstance evidence, or at least to fail to interview one of the parents, we decline to do so. Our prior decisions are inconsistent with any such rule. For example, in *Porter v. Singletary,* 14 F.3d 554, 556-60 (11th Cir.1994), we held that counsel was not ineffective for failing to contact the defendant's mother in an effort to develop mitigating circumstance evidence. None of the decisions cited in the dissenting opinion establish a per se rule that every, or even most, family members must be interviewed.[8] Moreover, the Supreme Court has told us in no

[8]Each of the decisions cited in the dissenting opinion for that proposition involve attorney performance facts that are readily distinguishable from Allen's performance in the new trial proceeding in this case. *Baxter v. Thomas,* 45 F.3d 1501, 1505-06, 1512-14 (11th Cir.1995), is a case in which counsel chose to present childhood abuse evidence but unreasonably failed to discover that the defendant had spent three of his teenage years in a state mental institution, the records of which were available to counsel. Those facts contrast with the present case, because Allen did discover that Williams had been in a mental facility for one week for an evaluation, which turned out to be negative, and after investigating the possibility of requesting another

21

uncertain terms that "[t]here are countless ways to provide effective assistance in any given case," and that "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Strickland,* 466 U.S. at 689-90, 104 S.Ct. at 2065-66. That is why there are no "rigid requirements" or per se rules in this area, and why the inquiry is focused on reasonableness given the circumstances counsel faced at the time. The one approach we are not supposed to take is the approach exemplified by the dissenting opinion, which relies upon all of the evidence which hindsight arguably shows could have been accumulated if counsel had conducted a perfect investigation.

It is true, of course, that in hindsight it probably would have been better if Allen had gone further

---

evaluation, Allen made a strategic decision not to do so. In *Blanco v. Singletary,* 943 F.2d 1477, 1500-03 (11th Cir.1991), defense counsel had five months to prepare for trial but waited until the night before the penalty phase began to do anything, and then when given four more days to obtain mitigating circumstance evidence made only a lackluster effort, which included no attempt to find available mental state evidence; instead of conducting a reasonable investigation counsel "essentially acquiesced in Blanco's defeatism without knowing what evidence Blanco was foregoing." *Id.* at 1501. In *Elledge v. Dugger,* 823 F.2d 1439, 1444-45 & n. 10 (11th Cir.1987), "counsel made no effort either to locate an expert psychiatric witness or to put on background character testimony from family members in mitigation;" even though personally convinced Elledge was "crazy" and aware that prison authorities had been giving him antipsychotic and other medications, counsel still made no effort to seek new expert advice or to otherwise pursue the issue.

The two defense counsel in *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.1989), conducted no investigation at all of mitigating circumstance evidence before the sentence hearing began, because each erroneously thought the other one was going to do it. A similar miscommunication occurred in *Jackson v. Herring,* 42 F.3d 1350 (11th Cir.1995), where one trial counsel thought the second one would bear "the bulk of the responsibility" for the sentence stage, while the second one thought the first would "take the lead in investigating mitigating evidence," *id.* at 1364 (marks, brackets, and footnote citation to record omitted). One counsel was "shocked" by the guilt stage verdict, and neither counsel had expected they would have only one hour after the verdict to prepare for the sentence stage. *See id.* "Between the time of petitioner's indictment and sentencing, her lawyers did no work on the sentencing aspects of her case," and "[n]o family members or friends were contacted." *Id.* at 1365 (quoting the district court's findings). Furthermore, counsel's failure to present any mitigating circumstance evidence at all in *Jackson* was "at least partially influenced by the prosecution's threat to introduce" in response to any such evidence a pending assault with intent to murder charge. That charge was not admissible because, as their client had accurately informed them, the charge was against her sister, not against her. *See id.* at 1368. Counsel's performance in *Jackson* in no way compares with Allen's performance in the motion for new trial proceeding.

22

along these lines and interviewed all of Williams' siblings and his father.[9] Yet, one of the clearest principles in this area of the law is that, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *see also Waters,* 46 F.3d at 1514 ("The widespread use of the tactic of attacking counsel by showing what 'might have been' proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge counsel's performance through hindsight.") Besides, insofar as the performance prong of an ineffective assistance inquiry is concerned, "[o]nce we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." *Rogers,* 13 F.3d at 388.

Allen's inquiry into whether Williams had done good things or suffered any deprivations that might serve as mitigating circumstances was not "outside the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Other attorneys might have gone further in the investigation, but that is not the test. As we have explained: "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Waters,* 46 F.3d at 1512 (quoting *White v. Singletary,* 972 F.2d 1218, 1220-21 (11th Cir.1992)). A reasonable lawyer in Allen's circumstances in the motion for new trial proceeding reasonably could have made the decisions he did.

---

[9]We say it "probably" would have been better, because it is by no means certain that Williams' sister (who was a guilt stage witness against him) or his father would have testified at the hearing on the motion for new trial to the same thing they signed their names to three years later in the affidavits prepared by Williams' present counsel. The district court was unconvinced that they would have. Allen himself, who had a great deal of experience with witnesses in criminal cases, was also skeptical, noting about the sister: "[w]hat she has said in an affidavit some years later and what she would have said back then are two different things." Nonetheless, in the present posture of this case we accept that the sister and father would have testified at the new trial motion hearing to the contents of the affidavits they later signed.

*The Mental State Mitigation Issues*

The principles of law that we have been discussing apply with equal force to the claim of Williams' present counsel that Allen was ineffective for failing to develop facts relating to Williams' mental state and not requesting a mental evaluation of him. Nothing that Allen learned from talking to Williams indicated that he was suffering from any mental disorder or disease. To the contrary, Allen found Williams to be intelligent, attentive, cooperative and polite. Williams was interested in what was happening, asked intelligent questions, and responded intelligently to Allen's questions. They had no problem communicating. *See, e.g., Baldwin v. Johnson,* 152 F.3d 1304, 1314-15 (11th Cir.1998) (failure to request a psychiatric examination not ineffective where nothing the defendant did or said indicated he had any mental problem), *cert. denied,* --- U.S. ----, 119 S.Ct. 1350, 143 L.Ed.2d 512 (1999).

When Allen spoke to Williams' mother, he did discover something Collins had overlooked. Allen learned from her that she had sent Williams to Georgia Regional, a mental facility, for about a week in 1985 in order to have him evaluated. She told Allen, however, that she had sent Williams there because he would not mind her. Thinking that few teenagers do mind their parents, Allen thought that was not going to be much help. Nonetheless, he questioned her further on the subject, but she was weak about it and did not give him much that was useful about Williams' mental condition.

Allen still tried to exploit that lead. He called or visited the superintendent at Georgia Regional, Dr. Everett Kuglar, with whom Allen had worked on numerous occasions in the past. Allen talked to Dr. Kuglar several times, telling him that Allen thought there had not been a proper medical investigation in the case, and that it should be pursued, and asking Dr. Kuglar to see if he could help with the issue. Dr. Kuglar had the record of Williams' stay and evaluation at Georgia Regional.

The word that came back to Allen was not good for the defense. Dr. Kuglar told Allen that there was nothing to indicate Williams suffered from schizophrenia or had any other mental disorder, and that there was no reason to conduct another evaluation of him. Dr. Kuglar said that Williams was just a sociopath.

24

Knowing that if he requested another mental evaluation of Williams, the court would send Williams back to Georgia Regional, Allen decided not to ask for one. He knew that if he did, it would likely hurt Williams by showing that Collins' failure to pursue a mental evaluation had not mattered. In Allen's words: "[f]rom my conversations with Dr. Kuglar I felt if I did take it a step further I probably wasn't going to like the result."[10]

At the time Allen made the strategic decision not to have Williams evaluated, he was aware of something about Williams wanting to conduct a religious ritual at the jail, and his having taken a temporary vow of silence. As it turns out, neither episode actually involved bizarre behavior.[11] In any event, Allen was also thoroughly familiar with the transcript of the trial, which contains abundant evidence that Williams was

---

[10]The dissent's treatment of the Georgia Regional mental evaluation of Williams, which was conducted less than a year before the crime was committed, is interesting in light of the undisputed fact that the evaluation found no evidence Williams suffered from any mental or psychological disease or disorder. Nonetheless, we are told that Allen should have regarded that week-long stay and evaluation as evidence of psychological problems (apparently more probative than the actual result of the evaluation). To the contrary, we believe that an evaluation by a reputable mental facility resulting in a report that rules out any mental or psychological disorder or disease indicates the absence of psychological problems, not the presence of them. Perhaps the thought is that surely Williams' mother would not have sent him to Georgia Regional merely because she was having problems making him mind her. But that is exactly what Williams' mother told Allen. In any event, after he could not get any more helpful explanation from Williams' mother, Allen still pursued the matter by contacting Dr. Kuglar and having him check the file for any suggestion that an additional evaluation would help. That is an entirely reasonable approach, more reasonable we think, than presuming that the fact an evaluation occurs is evidence supporting the opposite of what the experts who conducted that evaluation concluded.

[11]The "religious ritual episode" had to do with the request for some candles and a towel or tablecloth for a religious ceremony to celebrate the anniversary of Williams' christening. Collins and Williams' mother—not Williams himself—asked the assistant jailer to let Williams have those materials for that ceremony, but the jailer refused permission. Collins then asked Reverend Holmes, the counselor at the jail, to arrange the ceremony for Williams, but the record does not indicate whether it ever happened. There does not appear to have been anything bizarre about it.

The "vow of silence episode" stemmed from Williams' sometimes contentious relationship with Collins. They had more than twenty conferences together, but with one exception Williams adamantly refused to discuss the crime with Collins. Williams was convinced that his friends would not testify against him and the State could never prove its case. On one of the many occasions when Collins went to see him, Williams refused to talk at all, saying that he had taken a vow of silence. The next time Collins visited him, Williams talked freely about everything except the case. Collins was convinced Williams was very stubborn, liked to be the center of attention, and had to have his way about everything.

25

not suffering from a serious mental disorder. For example, it shows that shortly after he was arrested on March 12, 1986, Williams repeatedly tried to cut a deal with the investigating officer in which he would get a lesser sentence in return for information about the still missing girl. He wanted a written deal, but the officer refused to negotiate. Williams made up a story about how he had come to have the victim's purse and credit cards, saying that he had stolen them out of her car in the mall parking lot when she was not there. As the officer's questions became more pointed, Williams was wise enough to refuse to say any more until he had an attorney. He also refused to sign a written waiver. *See Williams v. State,* 258 Ga. at 283, 368 S.E.2d at 745-46.

Another example of how the trial transcript indicates that Williams did not suffer from serious mental problems involves the first pretrial proceeding, which took place on July 1, 1986. At that proceeding Williams expressed his dissatisfaction with, and made an objection to, having been indicted on more counts than he was bound over for at the preliminary hearing. In arguing his point, Williams referred to the date of his arrest, his attorney's letter demanding a preliminary hearing, and the fact that the preliminary hearing had concerned fewer charges than those contained in the subsequent indictment. Williams then sought and obtained permission from the court to ask the district attorney a question, which was: what evidentiary basis had there been for the indictment? The district attorney replied that Major Strength had testified before the grand jury, to which Williams responded that his understanding was that Strength had told the grand jury what a witness named Harold Lester had said.[12] Williams also asked the court to explain to him the *Miranda* decision, and he asked for an explanation about illegal search and seizure. Williams acknowledged that he had seen the prosecution's witness list, and that he had read and understood the indictment. During the trial,

---

[12]Major Strength was the investigator who had interrogated Williams after his arrest, while Harold Lester was one of the principal witnesses against Williams. *See Williams v. State,* 258 Ga. at 282-83, 368 S.E.2d at 745-46.

26

defense counsel made a motion to dismiss specific counts in the indictment at Williams' request.[13]

One of the State's witnesses at the trial was Jerry Smith, an acquaintance of Williams. Smith testified that one evening Williams asked him whether he had ever shot anyone. When Smith said that he had, Williams asked him what he had done with the body. Later on, while the two of them were talking in a parked car, Williams told Smith that he felt close to the girl, and that God had picked her out. In Smith's words, "He was just talking like that." Williams never said why he kidnaped, raped, and murdered the victim but did say he had shot her. The two men talked about how Williams had committed a sin, about how bad it was, and that he should not have done it. As Smith described it, they were "talking about God, and stuff, you know," and "just feeling down about it." The next day, at Smith's suggestion, they went over to Smith's mother's house and had a Bible study session, because Smith felt they should have one. Smith's mother is very religious, and he wanted Williams to meet her and talk with her. Three of their other acquaintances joined them at the house for the talk and Bible study session. All of these facts came out at trial.

After the jury had retired to deliberate concerning the sentence on August 29, 1986, a Unified Appeal Proceeding was conducted. During it, Williams made a number of objections some of which demonstrated how attentive he had been. For example, Williams objected because on August 26, the judge had talked to one of the jurors about a friend being in the hospital. He also objected to a brief conversation the judge had with a female juror on August 28, before the jury retired to deliberate concerning the guilt stage verdict. Williams said the conversation had occurred when the juror walked by the bench and stood by a chair. The trial judge, admitting it had happened, explained to Williams that the female juror had simply said to the judge "I'm losing weight going in and out so much," or words to that effect. Williams' behavior and statements during the trial and the Unified Appeal proceedings do not indicate he was suffering from a mental

___

[13]Williams was apparently no slouch as an attorney. He gave his jailers fits, and when they put him in lock-down, he filed a pro se lawsuit against them, kept them tied up in federal court for five days, and succeeded in winning a judgment for nominal damages against them. As one of the jailers against whom Williams obtained the judgment grudgingly admitted, Williams "did a pretty good job" representing himself in that case. That lawsuit was in 1988.

problem of any kind.

Moreover, Allen also knew from the trial transcript that Collins, who apparently had talked with Williams more than anyone else in the period leading up to the trial, saw no indication that Williams was mentally ill.

With all of this knowledge, and aware of the strong likelihood that another mental evaluation would reveal no mental illness, just like the one conducted less than a year before the crime, Allen decided not to request one. Even though he thought it would be unwise to request another mental evaluation, Allen nonetheless made the most he could out of Collins' failure to discover that Williams had been sent to Georgia Regional. Allen's strategic decision was "to leave it with the court that here was something very obvious that Mr. Collins didn't inquire into." That is exactly what Allen did. At the hearing on the motion for a new trial, Allen tried to get Collins to admit that Williams had behaved strangely from time to time, and he succeeded in getting Collins to admit he was unaware Williams had been sent to Georgia Regional. Allen then had Ms. Blair testify that Williams had been sent to Georgia Regional, that she never got a report concerning it, and that she had discussed with Collins the possibility of having Williams evaluated, but Collins had told her the court would not order a mental evaluation.

Strategic decisions, such as the one Allen made not to request another mental evaluation of Williams, are virtually unassailable, especially when they are made by experienced criminal defense attorneys. *See, e.g., Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Spaziano,* 36 F.3d at 1040; *Mills,* 63 F.3d at 1024. Indeed, the district court observed that Williams' present counsel have "not attacked Allen for making this tactical decision." They do, however, criticize him for not developing additional evidence about Williams' mental state, which they contend might have changed the prospects for another mental evaluation.

They argue, for example, that Allen should have investigated whether there were any records at the prison that might have been helpful on the mental state issue. One problem with that argument is that the December 11, 1986 prison record they point to was not generated until months after Williams was convicted,

28

sentenced to death, and sent to prison. As the district court pointed out, "Allen was looking for evidence that Collins could have found [at or before the August 29, 1986 sentence hearing], and these records were obviously unavailable to Collins." We agree, and add only that it would not have done Allen any good if he had found that record, because no court would conclude a trial attorney was ineffective for failing to discover a document that had not even been created at the time of his representation.[14]

Allen is also faulted for failing to discover and use a mental evaluation form that an assistant district attorney named George Guest had filled out before Williams' trial. Guest was not directly involved in Williams' prosecution, but he had signed a mental evaluation referral form for Williams, although years later he could not recall the form or the circumstances which had led to his signing it. He speculated the form might have been filled out at the request of Williams' pretrial counsel (not Collins). Guest had written on the form that the basis for it was: "[c]ircumstances of the case under investigation and the nature of the charges, also Defendant's references to 'being told by God' to do or not do certain things." When called upon to explain that at the state habeas evidentiary hearing, however, Guest had no knowledge or recollection about any of those things.[15]

The former district attorney who had prosecuted Williams testified at the state habeas hearing that

_____

[14]Williams' present counsel treat the document in question as though it were a highly significant finding arrived at through a reliable process of inquiry by prison mental health professionals. To the contrary, Dr. James C. Sikes, the psychiatrist charged with the task of seeing to Williams' mental health needs in prison, testified without contradiction that the document in question was a report generated by a computer at the prison without any human input, based solely upon the inmate's answers to a questionnaire. Someone had written a computer program and sold it to the prison, and there had been discussion about getting rid of it because of the confusion the reports it generates cause. Dr. Sikes also testified that he did not give the report much importance. In any event, it was not around to be used, or misused, at the time of the sentence hearing.

[15]The pretrial counsel, an attorney named Flanagan, was defense counsel for Williams at the time the form was filled out, and his name was handwritten onto the form. Flanagan was Williams' attorney for only a short time. Strangely, Flanagan was never called to testify at the state habeas or federal habeas evidentiary hearings. Present counsel for Williams, after they learned of the existence of the mental health referral form with Flanagan's name written onto it, submitted an affidavit from Flanagan about another matter, but that affidavit says nothing about the referral form.

he had no specific recollection of ever seeing the mental evaluation referral form in question, and that he did not know its origin. He said that such a document could have been filled out at the impetus of the defense attorney or the district attorney's office. That such a form was signed by a member of the district attorney's office did not mean it was generated at the request of someone within that office, because as a courtesy the office would prepare such documents for defense attorneys from time to time. This particular form did not have a judge's signature on it.

It is undisputed that the judge at Williams' trial conducted an in camera inspection of the district attorney's file and turned over to the defense any information whose disclosure he thought was required as a result of the *Brady* decision. It is also undisputed that this mental evaluation referral form was not among the records the judge ordered to be disclosed to Collins, and that neither Collins nor Allen knew of it. The form was not in Collins' file, which Allen obtained long before the hearing on the motion for new trial.

Williams' present counsel have failed to convince us that Allen's failure to discover the mental evaluation referral form puts his representation outside the wide range of reasonable professional assistance. Allen knew that the judge had conducted an in camera inspection of the district attorney's file and turned over any favorable evidence from it to Collins, whose files and records Allen obtained. The Supreme Court has recently held that it is reasonable for an attorney representing a defendant in a collateral proceeding (and that is what Allen was doing in the new trial proceeding) to rely upon the presumption that a prosecutor will fully perform his duty to disclose all exculpatory materials and the implicit representation that any exculpatory materials would be included in open files tendered to defense counsel for their examination. *See Strickler v. Greene,* --- U.S. ----, ----, 119 S.Ct. 1936, 1949, --- L.Ed.2d ----, ---- (1999). By the same token, it was reasonable for Allen to rely upon the district attorney's duty to disclose any exculpatory material to Collins coupled with the trial judge's in camera inspection of the district attorney's file. Allen's failure to discover

30

the form was not outside the wide range of reasonable professional assistance.[16]

Williams' present counsel also criticize Allen for not ferreting out from Williams' father and sister evidence concerning his life and behavior that would have been helpful in establishing mental health mitigating circumstances. But as we have previously held, Allen's failure to interview them did not place his representation outside the wide range of reasonable professional assistance.

Allen conducted a reasonable investigation into the possibility Williams suffered from sufficient mental problems that Collins' failure to present mental state mitigating circumstances met the performance and prejudice prongs of the ineffective assistance of counsel standard. Allen's strategic decisions about the scope of his own investigation into Williams' mental state and about whether to request another evaluation were reasonable. Other attorneys might have done more or less than Allen, or they might have made the strategic calls differently, but we cannot say that no reasonable attorney would have done as he did. And "the test is whether some reasonable attorney could have acted, in the circumstances, as [this one] did." *Waters,* 46 F.3d at 1518. Because Williams has failed to meet the requirements of the performance prong, we have no need to address the prejudice prong of the ineffective assistance test.

**CONCLUSION**

We agree with the district court's conclusion that Williams has failed to establish that Allen's performance in the motion for new trial proceeding constitutes ineffective assistance of counsel. It follows

---

[16]Because Allen was not ineffective for failing to discover the referral form, we need not address whether the form, if it had been discovered, would have made any difference. *See, e.g., Rogers,* 13 F.3d at 388 ("Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced."). We do note, however, that Williams' present counsel in their zeal appear to have overstated the importance of the referral form. They submitted an affidavit from Dr. Kuglar saying that if he had known of the form and other facts these attorneys represented to him he would have recommended to Allen that he have Williams evaluated. However, Dr. Kuglar had not been shown the actual referral form in question. When he took the stand at the state habeas hearing and learned that the referral form had not been signed by a judicial officer, Dr. Kuglar testified that such a form "becomes an important document to me" when it is signed by a judge, which this one was not. He explained that, "based upon our using these documents, it would not have validity unless it is signed by a Judge, a Magistrate and this kind of thing."

31

that Williams has failed to show cause for the failure to present in that hearing the evidence he now relies upon to support his claim that trial counsel Collins was ineffective with respect to the presentation of mitigating circumstances at the sentence stage. Accordingly, we reject Williams' ineffective assistance of trial counsel claim.

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

The Supreme Court has ruled that it is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. *See Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987). In this regard, the jury should consider and weigh the "particularized nature of the crime and the particularized characteristics of the individual defendant." *Gregg,* 428 U.S. at 206, 96 S.Ct. 2909. Yet the "particularized characteristics" of Alex Williams, a 17-year-old boy at the time of the crime, have never been considered by any judge or jury in deciding whether the death penalty would be a constitutionally appropriate punishment. This absence of mitigating evidence is especially egregious in light of the Supreme Court's conclusion that mitigating evidence is "particularly relevant" when considering whether or not to sentence to death a teenager with a family history of parental abuse. *See Eddings v. Oklahoma,* 455 U.S. 104, 116, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (finding "no doubt" that evidence of 16-year-old boy's turbulent family history, beatings, and severe emotional disturbance should have been given weight as mitigation evidence because "[o]ur history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults"). I therefore respectfully dissent.

At Williams' trial, the only evidence of mitigation presented by trial counsel O.L. Collins was the extremely brief and superficial testimony of Williams' mother and one friend, the extent of whose relationship

32

with Williams was never established.[1]  The essence of the mother's brief testimony was that she may have

been too "firm" with Williams at times, that he was a good boy who never talked back, and that he collects

comic books and rare coins.   His friend simply testified that they had skated together and that

(notwithstanding the overwhelming evidence of guilt) she did not believe he had committed the crime.  The

only evidence Allen added at the new trial hearing to show that Collins was ineffective for failing to present

more at the sentencing phase was the record from the Georgia Regional Hospital, where Williams spent a

week less than a year before the crime, allegedly because "he wouldn't mind his mother." *See* Majority Op.

at 3783 - 3784.  Thus the comparison of aggravating and mitigating circumstances presented both by Collins

to the judge and jury at trial and by Allen to the judge at the hearing on the motion for new trial was the rape

and shooting of a young girl on the one hand and, on the other hand, Williams' mother's request that her son

be spared essentially because he was a good boy who read comic books and never talked back.

This bland picture of Alex Williams, however, failed entirely to capture the reality of his young life.

As the affidavits of Williams' father and sister make clear, the mitigating evidence easily available[2] to either

attorney at either phase, had they but made the effort to speak to other family members, would have painted

an enormously different picture.[3]  For example, Williams' sister tells that when she and Williams were young,

---

[1]The majority opinion says the friend knew him "well," but there is nothing in the penalty phase transcript to suggest close relations.

[2]Williams' sister lives in the town where Allen works, and Williams' father not far away.  It would thus hardly take the resources of a big law firm, see Majority Op. at 3789, to perform the basic task of interviewing them.  Indeed, the prosecution was able to find the sister and put her on the stand, so that she could testify to having seen a necklace belonging to the victim shortly after the murder.

[3]The majority suggests that this dissent advocates a "per se rule" that all lawyers must interview "every member of the defendant's family for possible mitigating circumstances evidence." *See* Majority Op. at 3790 - 3791.  This grossly mischaracterizes the above discussion.  There will indeed be situations where a failure to contact one or even more family members will, under certain circumstances, not constitute ineffective assistance of counsel.  This, however, is not one of them.  In the context of this defendant's young life, it is not reasonable for a lawyer to ignore obvious indicators of mitigating evidence.  For all the reasons described herein, such negligent ignorance flies in the face of common sense and practice, as well as what this circuit requires.  *See, e.g. Jackson v. Herring,* 42 F.3d 1350, 1367 (11th Cir.1995) (Court found ineffective assistance of counsel where lawyer "had a small amount of information regarding possible mitigating

they were raised mostly by their grandmother, who "took everything out" on Williams. His grandmother beat him with a glass slipper and a tree limb. As for their mother, she would often disappear for days at a time. When Williams' mother was home, she consistently whipped him if he did not "mind" her. A typical punishment for mistakes as small as missing curfew was to lock him out of the house. Once she gave them a choice between coming inside or being whipped with a barbell. Another time she "used a hammer and screw ... to make [Williams] mind her." Often she used her hands or belts. Yet another time Williams' mother locked him outside the house without any clothes on and told him "he would have to leave the same way he came into this world, naked." Williams' father confirms this abuse, saying that "[w]hen Alex was still little, I have seen Pat shake him until I thought his head would come off. I have seen her whip and beat him with such anger and vehemence you would think she was possessed by the devil."

Even when locked outside the house naked, Williams's sister says Williams "wouldn't talk back or cry or yell or fight or nothing, even though he was old and big enough to help himself. He wouldn't.... [H]e'd just leave the house for weeks at a time." As Williams' father similarly recalls, "Alex's reactions to these abuses always shocked me. He hardly reacted at all. He would never talk back or try to get away. He'd take it, like he expected it. When he was young he'd go to his room and stay there for hours. As he got older, if he wasn't thrown out, he'd disappear from the house for weeks at a time and even longer." Both Williams' sister and father, moreover, observed bizarre behavior on Williams' part which signaled psychological problems. The sister remembers her brother being obsessed with an inscrutable religion. "This was [Williams'] own religion and I didn't understand it. I remember real well this one visit at the jail where ... [Williams] announced you are from the breastbone of your husband." His father recalled his son having "crazy ideas" that he communicated with people without talking to them.[4]

---

evidence regarding [his client's] history, but ... inexplicably failed to follow up with further interviews and investigation.")

[4]Had Collins and Allen obtained the information subsequently provided by Williams' sister and father, their interviews of the mother would have yielded completely different testimony to that which she initially

None of this relevant evidence was presented at trial or at the motion for new trial. I believe this omission constitutes ineffective assistance of counsel on both the part of Collins and Allen. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), defines ineffectiveness of counsel as those "acts or omissions of counsel ... not to have been the result of reasonable professional judgment," or which are "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. Certainly, as the majority suggests, whether a lawyer is generally competent and experienced may have some relevance to the question of whether that lawyer has provided effective assistance of counsel. It is axiomatic, however, both from our case law and from common sense, that notwithstanding general competence and success, a lawyer can fail to provide effective assistance of counsel in a given case. As the Supreme Court has explained, in making that determination, our job is to "keep in mind that counsel's function ... is to make the adversarial testing process work *in that particular case." Id.* at 689, 104 S.Ct. 2052 (emphasis added). Thus, the narrow question before us is not Allen's general competence, but whether in *this* particular case, his failure to conduct a reasonable investigation of mitigating circumstances constituted ineffective assistance of counsel. *See Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1994) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence."). More specifically, the question is whether the failure to interview Williams' immediate family members, which would at the very least have disclosed the mitigating evidence described above and likely led to more, constitutes ineffective assistance of counsel.[5]

provided. For example, in her subsequent affidavit, Williams' mother testified that, when he was in jail for a minor offense during a period prior to the murder, her son told her that a light had appeared, and a voice spoke to him from it, when he was in his cell. Instead, to prepare for trial, Collins simply talked to the mother over the phone asking for names of people who would "say something nice about Alex." The night before the sentencing phase, Collins merely told the mother to be ready to say something "nice about Alexander at the trial" and bring along others who might "say something nice." Allen's recollection of his interview with the mother was that it did not consist of much more.

[5]The majority recognizes the fact that Allen only had 11 days to conduct the investigation. Allen did not, however, use the time he had to conduct a reasonable investigation of Williams' life. It is not unreasonable to expect that in eleven days Allen could have found time to talk to the father and sister, whose interviews

The majority, answering this question in the negative, does its best to justify Allen's failure. The majority suggests that "to be effective a lawyer is not required to 'pursue every path until it bears fruit or until all hope withers.' " *Id.* at 3789 (quoting *Foster v. Dugger,* 823 F.2d 402, 405 (11th Cir.1987)). It contrasts the resources Allen had available to him at the time of the new trial motion hearing with the more extensive "resources and time" available to Williams' current "squad of attorneys." *Id.* at 3789. It dismisses as "hindsight" the suggestion that Allen ought to have interviewed Williams' father and sister. *See id.* at 3790 - 3791 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

However, in offering these arguments, the majority misses the point. To provide effective assistance of counsel, Allen was not required to " 'pursue every [available] path.' " Majority Op. at 3789 (quoting *Foster,* 823 F.2d at 405). He was simply required to pursue the most obvious source from which all reasonable investigations into an individual's character begin: the family. Allen had all the time and resources he needed to perform this basic task. That he lacked a large law firm's resources or a "squad of attorneys" is therefore irrelevant.[6]

Nor is it the case, as the majority suggests, that the implications of Allen's failure to interview Williams' immediate family members are obvious only in "hindsight." Quite the opposite. Our circuit has long recognized that failing to interview family members is indicative of ineffective assistance of counsel. *See Baxter v. Thomas,* 45 F.3d 1501, 1513 (11th Cir.1995) (finding that reasonable investigation would have included family members where trial counsel spoke to defendant's mother and brother, but not other family members); *Blanco v. Singletary,* 943 F.2d 1477, 1501-02 (1991) (counsel ineffective for failing to undertake

---

might have served as a basis for a continuance to obtain mental health experts, or could have been forwarded to Dr. Kluger. Nor is it unreasonable to expect that Allen, who had already been working for a year on the motion for a new trial and was by his own admission intimately familiar with the transcript, should have devoted at least a good part of those 11 days entirely to investigating possible mitigating evidence. The majority mentions that the evidence of guilt was overwhelming, which is all the more reason why Allen should have spent this time concentrating on the sentencing phase.

[6]The suggestion that Allen's failure to interview Williams' father and sister was a function of the resources available to him at the time is particularly implausible given their proximity.

36

investigation into mitigating evidence from family members); *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.1989) (finding counsel deficient for neglecting to undertake investigation into family, military, and employment background); *Elledge v. Dugger,* 823 F.2d 1439, 1445 (11th Cir.1987) (finding counsel's investigation unreasonable where counsel was aware of defendant's difficult childhood, but "did not even interrogate [the defendant's] family members to ascertain the veracity of the account or their willingness to testify"). The thinking behind these cases is reflected clearly in the seminal treatise advising lawyers on how to represent a death penalty client, *Federal Habeas Corpus Practice and Procedure,* which lists 17 major information sources necessary for fact gathering in post-conviction proceedings. Besides the client, the family is *the most important* source to look for relevant information when pursuing post-conviction relief in state or federal court.[7]

The majority makes much of Allen's conferring with death penalty legal experts Stephen Bright and George Kendall. No doubt these experts, who are well aware of the importance of interviewing immediate

---

[7]The 1988 version of this treatise reads as follows:

Potential sources of factual information include:

(A) The client.

(B) Members of the client's family, including:

1. Family members in contact with the client since trial

2. Family members who attended the trial

3. Family members in contact with the client at the time of the arrest and pretrial incarceration

4. Family members in contact with the client at the time of the offense

5. Family members in contact with the client at any time prior to the offense

2 James S. Leibman, *Federal Habeas Corpus Practice and Procedure* 737-38 (1998) (footnotes omitted).

family members in this context,[8] would have advised Allen to do so.  In this case, however, the record is silent on the substance of Allen's conversations with these admittedly eminent attorneys,[9] and in any event, the point is not whether Allen conferred with Bright and Kendall, but what Allen himself ultimately did or did not do. And what he did not do was interview the available members of Williams' immediate family.

Moreover, plenty of red flags existed to place any reasonably effective lawyer on notice that family members would be indispensable to a basic investigation.  At the time of the crime, Williams was an adolescent living at home, directly under his family's influence.  He had problems in school.  He also had significant problems at home, as evidenced by the fact that he moved in for a time with his father.  His return home at age 14 after eight months with his father likewise suggests problems in his father's home.  It is important to keep in mind that Williams committed this crime at age seventeen.  Given this time frame, it is unreasonable to suggest, as does the majority, that Allen need not have interviewed the father because Williams' stay with him was too remote to matter.

Finally, Allen knew Williams was committed to a mental institution for an entire week, allegedly for intransigence, which on its face seems an implausible ground for committing someone to a mental institution. The majority argues that this evidence is of little value because Dr. Everett Kuglar (who in his affidavit makes clear that he had never seen or spoken with Williams) said that the report did not indicate that Williams suffered from a mental disorder or schizophrenia.  However, as Allen himself has admitted, if Allen had talked to family members, he would have conveyed the information they provided to Dr. Kuglar, who without this information was unable to approach the report with any sort of contextual understanding.  Dr. Kuglar

---

[8]*See* Stephen B. Bright, *Advocate in Residence:  The Death Penalty As the Answer to Crime:  Costly, Counterproductive and Corrupting,* 36 Santa Clara L.Rev. 1069, 1085-86 (1996) ("The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.")

[9]The record gives no details as to what Allen discussed with Bright and Kendall.  Allen merely says he "consulted at considerable length" with Kendall, and talked with Steve Bright "on numerous occasions."

himself testified by affidavit that the information attested to by Williams' other family members[10] regarding Williams' behavior suggested schizophrenia and that he would have had a very different conversation with Allen had he been aware of the information regarding Williams' behavior at the time of the interview. Indeed, Kuglar directly states that had he "had the benefit of the foregoing information, [he] would have recommended that Allen secure a psychiatric examination for Alexander Williams...."

In making a reasonable effort to discover the source of a 17 year old's violence, it is not enough, as Allen did, to take uncritically the brief comments of a single source, particularly someone who simple logic suggests could well have had a role to play in the conditions leading to Williams' aberrant behavior.[11] In doing so, Allen repeated the same error made by Collins: notwithstanding the proximity of the family members, he failed to conduct a rudimentary investigation which would have discovered significant mitigating evidence. It is as unreasonable and ineffective to have omitted interviews with family members in this case as it would be for a lawyer to omit interviews with eyewitnesses to an accident in a negligence case.

Moreover, Allen's failure is especially troubling in light of the fact that counsel was also on notice of potential psychiatric problems. Allen knew that Williams had been in the Georgia mental hospital *less than one year before the crime.*[12] This stay was not simply for an outpatient evaluation or one day of tests. He was there for an entire week. Universally, teenagers fail to mind their parents. But they ordinarily do not spend a week in a mental hospital because of it. This alone should have raised questions, and reasonable professional judgment would have dictated further investigation. *See Baxter,* 45 F.3d at 1513 ("[B]ecause

___

[10]For example, that Williams' was obsessed by God, and that he had been visited by "a presence or a light" from which he heard a voice when he was in jail.

[11]Allen's experience as the former County District Attorney should have made him familiar with many cases in which the mitigating circumstances included abuse at the hands of one or both parents.

[12]Having read the trial transcript, Allen also knew that Jerry Donnell Smith had testified that Williams had told him that God had chosen the victim in this case.

39

defense counsel was aware that [the defendant] was behaving oddly and asked the court that [the defendant] be evaluated by a psychiatrist, they were on notice of potential psychiatric problems in [the defendant's] background."); *Jackson v. Herring,* 42 F.3d 1350, 1367 (11th Cir.1995) (finding investigation into mitigating evidence unreasonable where counsel "had a small amount of mitigating evidence regarding [the defendant's] history, but ... inexplicably failed to follow up with further interviews or investigation"); *Cunningham v. Zant,* 928 F.2d 1006, 1018 (11th Cir.1991) (finding failure to present evidence concerning defendant's mental retardation unreasonable "in light of the ready availability of this evidence"); *Middleton v. Dugger,* 849 F.2d 491, 493-94 (11th Cir.1988) (finding that counsel's investigation was unreasonable where counsel failed to uncover "readily discoverable" mitigating evidence concerning defendant's psychiatric problems).

Finally, Allen's failure to investigate and present the mitigating evidence reflected in the affidavits could not possibly have been a tactical decision. First, a tactical decision must be an informed one. This is not a case of having the information and deciding not to present it, for Allen neglected to gather the relevant information in the first place. *See Jackson,* 42 F.3d at 1368 ("[A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.").[13] Moreover, Allen was not constrained by the tactical considerations of influencing a jury because his responsibility was to show that Collins was ineffective in adequately investigating the available mitigating evidence. Thus, Allen had nothing to lose and everything to gain by interviewing family members and obtaining a psychiatric evaluation of Williams.

Alexander Williams is entitled to have a jury deciding whether to impose a sentence of death consider

---

[13]If the decision was a tactical one, it will usually be upheld, since counsel's tactical choice to introduce less than all available mitigating evidence is presumed effective. *See Jackson v. Herring,* 42 F.3d 1350, 1366 (11th Cir.1995). "Nonetheless, the mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." *Stevens v. Zant,* 968 F.2d 1076, 1083 (11th Cir.1992); *see also Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

the particularized characteristics of his young life at the time he committed the crime. For the reasons articulated above, I believe both Collins and Allen failed to provide Williams with effective assistance of counsel. Under *Strickland,* Williams must show that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. In my judgment, looking at the totality of the record I believe that there is a reasonable probability that but for Collins' and Allen's unprofessional errors, the results of the proceedings would have been different.[14] Collins' failure to present the mitigating evidence a reasonable investigation would have unearthed undermines confidence in the outcome of the sentencing phase. Allen's subsequent failure to take the steps reasonably required to prove Collins' ineffectiveness in this regard undermines confidence in the outcome of the hearing on Williams' motion for a new trial. Allen was therefore ineffective, and Williams is entitled to a new sentencing hearing.

---

[14]Moreover, we note that under Georgia law, the jury need not "balance aggravating against mitigating circumstances pursuant to any standard. In Georgia, juries may withhold the death penalty for any reason, or without any reason...." *Smith v. Francis,* 253 Ga. 782, 325 S.E.2d 362, 365-66 (Ga.1985).